In re The **RATH PACKING COMPANY,**
an Iowa corporation, Debtor.

**Bankruptcy No. 83–02293.**

United States Bankruptcy Court,
N.D. Iowa.

Nov. 22, 1985.
As Amended Nov. 27, 1985.

Robert Tieg, Asst. U.S. Atty., Cedar Rapids, Iowa, for the I.R.S.

Donald R. Cassling and Ronald R. Peterson, Jenner & Block, Chicago, Ill., for debtor.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge, Sitting by Designation.

### INTRODUCTION

This matter is before the Court on the Internal Revenue Service's objection to the debtor's post-confirmation modification of the first amended plan of liquidation and a request for no confirmation of plan because tax avoidance is its principal purpose made by Assistant United States Attorney Robert Tieg on behalf of the Internal Revenue Service, in open court, on October 25, 1985. Attorneys Ronald R. Peterson and Donald R. Cassling of Jenner and Block, Chicago, Illinois, represented the Debtor, The Rath Packing Company. Other parties represented included the Iowa Department of Revenue, Travelers Insurance, the Iowa Commissioner of Insurance, Employers Creditor and Equity Committee, the United Food and Commercial Workers, Creditors Committee, the City of Waterloo, the U.P.

G.W.A., Local 220, and the Black Hawk Economic Development Corporation.

## BACKGROUND

The Rath Packing Company (the "Debtor") is an Iowa corporation which engaged primarily in the meat processing and packaging business. The Debtor is presently a publicly held corporation, having approximately 5,100 shareholders of record who own 2,992,750 shares of common stock.

Begun in 1891, the Debtor was for many years a profitable and well-known institution in the meat packing industry. During the 1970's, however, the Debtor began experiencing severe financial problems due to high production costs and intense competition. Most traditional smokestack American industries encountered these same problems.

The Debtor attempted to find a workable solution. In 1979, in exchange for labor concessions, the Debtor's employees became the owners of sixty percent (60%) of the issued and outstanding stock of the company. With the cooperation of the collective bargaining representatives, the Debtor terminated its pension plan payments in 1982, thereby saving millions of dollars. The Debtor still owed the Pension Benefit Guaranty Corporation ("PBGC") almost seven million dollars. When faced with mounting costs and increasing losses, the Debtor unsuccessfully sought an additional five-million-dollar line of credit in October, 1983. Cash flow projections showed that the Debtor would be out of working capital in early November, 1983.

On November 1, 1983, the Debtor filed for Chapter 11 protection. As part of its reorganization effort, the Debtor closed several of its non-Iowa facilities and attempted to lower plan operating expenses. Although these and other related actions resulted in considerable savings for the Debtor, these savings were offset in large part by insufficient working capital, poor fresh meat margins, and lawsuit expenses. As a result, the Debtor, on December 31, 1984, ceased all of its operations, except management functions necessary to sell remaining inventory, collect accounts receivable, and protect collateral of the secured lenders.

On February 1, 1985, the Debtor filed a proposed plan of reorganization. That plan was contingent upon the Debtor's selling one of its plants and executing subordination agreements with several of its secured lenders. Despite a successful plant sale, the Debtor was unable to secure long-term financing which was necessary for effective reorganization. As a result, the Debtor filed a plan of liquidation on February 19, 1985.

On July 8, 1985, the Debtor's plan of liquidation was confirmed. The plan provided for the sale of remaining assets at privately negotiated sales during the first six months and, thereafter, at public auction.

On this same date, Attorney Cassling, who is one of the Debtor's attorneys, explained a plan modification proposal which they were considering. The crux of the proposal was that with the assistance of a small group of experienced investors (Black Hawk Capital Corporation) and formation of a Debtor subsidiary (Liberty), substantial sums of capital may be generated for the purpose of purchasing healthy corporations, thereby effectuating a substantial increase in the value of Debtor's stock. As part of this proposal, the Debtor would restructure its equity and distribute new common stock to unsecured claimants[1] as full satisfaction of their claims. The Debtor's shareholders' stock holdings would be exchanged for new common shares. Without the modification, these unsecured claimants and shareholders were estimated as receiving nothing under the plan. The investors would also acquire a certain amount of the Debtor's shares for a set price. The advantages to the investors would include the acquisition of a corporation with publicly held status and widely distributed stock, as well as a 35 million-dollar tax loss carry-forward. No specific

---

**1.** Unsecured creditor claims are estimated at    over 30 million dollars.

details were provided. The Court expressed concern at that time about the issue of tax avoidance, noting that the Code prohibits trafficking in corporate shells, and asked that the parties prepare to address those issues should the modification be proposed to the Court.

On September 26, 1985, the Debtor filed its plan modification. 11 U.S.C. § 1127(b). The Black Hawk Capital Corporation[2] ("Black Hawk") was described as a financial consulting and management firm which "has no significant assets and has not conducted any business other than in connection with the proposed acquisition of the stock and notes of the reorganized Debtor and Liberty."

The disclosure statement summarized the details of the proposed modification as follows:

### Proposed Modifications

The basis for this proposed modification to the Debtor's Plan is a proposed Stock Purchase Agreement to be executed by the Debtor, by a newly-created subsidiary of the Debtor, Liberty Capital Corp. ("Liberty") and by an investor, Black Hawk Capital Corp. ("Black Hawk"). Black Hawk also shall act as agent for a group of individual investors it will select ...

. . . .

The following is a summary of the transaction proposed in that agreement:

A. All of the Debtor's assets (except for $100,000 and Debtor's shares of Liberty) and all of its obligations will be transferred to a liquidating trust. In addition, 1,000,000 shares of the Debtor's New Common Stock (as hereinafter defined) will be transferred to the liquidating trust for creditors' benefit. All creditor claims will be satisfied from the assets held in this liquidating trust according to the terms of the Debtor's original Plan except that the New Common Stock of the Debtor will be distributed in accordance with subparagraph D herein. Thus, the modification will not delay or adversely affect the liquidation contemplated by the original Plan (except for the $100,-000 to be left in the Debtor as part of the proposed transaction). Distributions to creditors from the trust shall be in full satisfaction of creditors' claims and the Debtor shall receive a discharge under 11 U.S.C. § 1141.

B. The authorized capital stock of the Debtor will be increased to 50,000,-000 shares of common stock, par value $.01 per share (the "New Common Stock") and 10,000,000 shares of preferred stock, par value $.01 per share, and the presently authorized 3,000,000 shares of the Debtor's common stock, par value $1.00 per share, will be cancelled.

C. The Debtor currently has 2,992,-750 shares of $1.00 par value common stock issued and outstanding which on or before the closing date will be converted to 2,992,750 shares of the New Common Stock. The Debtor's current shareholders will continue to hold their existing common shares which will now be converted to a par value of $.01.

D. One million shares of the New Common Stock of the Debtor will be distributed to unsecured creditors holding Class VI Claims so that Class VI creditors will hold seventeen percent (17%) of the Debtor's common shares. Class VII shareholders will hold fifty-two percent (52%) of the Debtor's common shares. Black Hawk and the investors it will represent will acquire 1,762,000 shares of the New Common Stock for the purchase price of $176,-200 at closing. At the closing, Black Hawk and the investors will hold thirty-one percent (31%) of the Debtor's common shares.

---

**2.** This is a Minnesota corporation which was incorporated August 9, 1985. The five founders include an attorney, a certified public accountant, an ex-banker and consultant, an investment specialist, and a meat industry consultant.

E. A new subsidiary of the Debtor, Liberty, will be formed with 20,000 shares of common stock, par value $.01 per share, 19,000 of such shares shall be designated Class A common stock and 1,000 of those shares shall be designated Class B common stock. Prior to the closing, Liberty shall issue to Rath 4,000 shares Class A common stock. At the closing, Liberty will issue to Black Hawk and the Investors 1,000 shares of the Class B common stock, for an aggregate purchase price of $1,000. At closing, the Debtor will hold eighty percent (80%) of the common stock of this subsidiary and the Black Hawk investor group will hold twenty percent (20%). Liberty shall also issue and sell options to acquire 15,000 shares of Liberty's $.01 par value Class A common stock for the exercise price of $25 per share to Black Hawk and the Investors. The purchase price for the options will be $50,-000. When the options are exercised, Black Hawk and the investors will own eighty percent (80%) of Liberty's outstanding common stock and Rath will own twenty percent (20%).

F. The closing shall take place no later than December 27, 1985, unless Black Hawk and Debtor agree to a later date in writing.

G. The Black Hawk investors will be required to loan Liberty funds to acquire new businesses. The total borrowing ability from the Black Hawk investors shall be $10 million at 12% per annum interest. Liberty will not be required to repay any principal or interest for five years after the date of the loan. Thereafter, principal and accrued interest shall be repayable in twenty quarterly payments. If any investor fails to loan money to Liberty as required under the Stock Purchase Agreement, he or she will forfeit all options and may be subject to other damages.

H. Liberty and the Debtor will file consolidated income tax returns and will execute a tax allocation and sharing agreement.

I. The twenty shareholders of the Debtor holding the largest number of shares will execute a "standstill agreement" pursuant to which they shall agree not to acquire additional shares of the Debtor for three years.

J. The Debtor shall establish an Incentive Stock Option Plan within the meaning of Section 422A of the Internal Revenue Code as added by Public Law 97-34, the Economic Recovery Tax Act of 1981.

On October 25, 1985, a confirmation hearing on the proposed modification was held. After taking appearances and receiving an update on the administration of the estate, the Court requested a report on the balloting. Attorney Cassling reviewed the balloting on the record[3] and then submitted

3.
Class I—Administrative and Pre-petition Priority Expense

| | |
|---|---|
| 563 Acceptances | $10,262,676.58 |
| 162 Rejections | $ 1,196,152.03 |
| 18 No Votes | $ 172,113.86 |
| | $11,630,942.47 |

Class III—City of Waterloo

Stands on Prior Acceptance
(Approximately $4,500,000.00)

Class II—Tax Claims

5 Acceptances $39,174.04
No Rejections

Class IV—Pension Benefit Guaranty Corporation

Approximately $6,500,000.00 accept

the proposal for confirmation stating that the requirements of Section 1129(a) had been met.[4]

The IRS sets forth the following reasons for its objection:

1. The Internal Revenue Service filed proofs of claim in this proceeding dated May 1, 1984 and September 24, 1984.... The claims show that the Internal Revenue Service possesses unsecured priority claims for pre-petition taxes and interest and unsecured general claims, which remain unpaid.

2. A basic point of the proposed modifications to the plan is that a liquidating trust will be established to fulfill the payment terms, as per the confirmed Debtor's First Amended Plan of Liquidation. All of debtor's assets are to be transferred to the trust *except* for $100,000.00, which will remain with the debtor and will no longer be available to the creditors. This is detrimental to the Internal Revenue Service, and other creditors provided for by the confirmed plan because the assets available for distribution will be reduced by $100,000.00 without consideration flowing in to compensate the Internal Revenue Service and similarly situated creditors.

3. Furthermore, the Debtor has failed to adduce facts to demonstrate that it will be able to consummate the payment provisions of the confirmed plan without the $100,000.00 in assets it proposes to exempt from distribution; debtor has failed to furnish specific figures showing the value of assets that will be available for distribution to the creditors if the plan is modified.

Debtor's counsel argued that the IRS lacked standing to object to plan confirmation because the IRS claims were untimely filed and, therefore, it has no interest in the reorganization.[5] The Court took the matter under advisement.

Upon Court inquiry, Attorney Tieg, on behalf of the IRS, contended that the Debtor's plan as modified should not be confirmed because the principal purpose of the plan is the avoidance of taxes, violating 11 U.S.C. § 1129(d).

After insisting that the IRS lacked standing to argue Section 1129(d) because it was not a "party in interest," Attorney Cassling offered testimony of Harry Nelson, who is the Chairman of the Board of Black Hawk, to show that the principal purpose of the plan modification is not the avoidance of taxes. On direct exam, Mr. Nelson testified that Black Hawk's principal interest in the Debtor is its publicly held status and its secondary interest is the 35 million-dollar tax loss carry-forward. While unable to place a value on the Debtor's publicly held status without the tax loss, Mr. Nelson noted that it may take as long as seven years and several hundred thousand dollars to achieve publicly held status. He also stressed that the Debtor was especially attractive because its stock interests were widely distributed and no one entity or

Class V—Black Hawk County
Economic Development Committee

Acceptance $366,525.00

Class VII—Shareholders

| 1,082 Acceptances | $126,493.53 |
| 196 Rejections | $ 1,411.00 |
| 77 No Votes | $ 3,290.00 |
| | $131,194.53 |

Class VI—Unsecured

| 191 Acceptances | $30,533,020.79 |
| 19 Rejections | $ 151,877.43 |
| 6 No Votes | $ 8,596.93 |
| | $30,719,546.70 |

---

4. Attorney Cassling offered to call two witnesses and show through a question-and-answer method that the eleven requirements of 11 U.S.C. § 1129(a) were satisfied.

5. The Court, on its own motion, set March 15, 1984, as the pre-petition claims bar date under Bankruptcy Rule 3003(c)(3).

individual owned a substantial "block." Finally, he represented that the five Black Hawk investors anticipate generating up to ten million dollars for initial funding of corporate purchases.

On cross-exam, Mr. Nelson, while admitting that he would not have been interested in the Debtor without the tax loss, offered that he would not have been interested in the Debtor if it was not also publicly held. Reiterating that the 35 million-dollar tax loss carry-forward was not the principal, but the secondary, reason for Black Hawk's interest in the Debtor, he admitted that Liberty's (Debtor subsidiary's) purpose is to attempt to purchase healthy corporations with at least one million dollars in pre-tax profit.

The Court directed that the parties also address the issue of whether the plan as proposed substantively effects a corporate discharge violating the spirit of 11 U.S.C. §§ 1141(d)(3)(C) and 727(a) when the unsecured creditors receive stock in the corporate debtor as full satisfaction of their claims.

## LEGAL ISSUES

The principal issues raised are:

1) Whether the IRS's claims should be disallowed because they were not timely filed?

2) Whether the IRS has standing to object to the modification as its claims are disallowed?

3) Whether the principal purpose of the plan is the avoidance of taxes as prohibited by 11 U.S.C. § 1129(d)?

4) Whether the plan as proposed substantively effects a corporate discharge violating the spirit of 11 U.S.C. §§ 1141(d)(3)(C) and 727(a) when the unsecured creditors receive stock in the corporate debtor as full satisfaction of their claims?

6. *See also* Bankr.R.P. 2002(a)(8) and Bankruptcy Code Section 1111(a).

7. Bankruptcy Rule 3003(c)(2) reads as follows: Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated

## CONCLUSIONS OF LAW

■ On the first issue, the Court holds that the IRS's claims are disallowed because they were untimely filed.

On November 1, 1983, the Debtor filed its original petition for relief. The Debtor scheduled the IRS as a creditor in an unknown amount. Under Bankruptcy Rule 3003(c)(3), the Court, on its own motion, set March 15, 1984, as the pre-claims bar date.[6] The IRS did not, however, file its claims until May 1, 1984, and September 24, 1984. Notice was sent to all creditors, including the IRS, with the Section 341 meeting notice.

Bankruptcy Rule 3003(c)(2)[7] requires the following:

1. Creditors listed as amounts unknown *must* file a proof of claim.

2. The claim *must* be filed within the time set by the Court.

3. Failure to timely file a claim denies the creditor voting and distribution rights.

In the instant facts, the IRS filed its claims after the March 15, 1984, pre-petition claims filing bar date and no extension was requested. *See* 3003(c)(3). Therefore, the IRS's untimely filed claims are disallowed. *See In re Honeycutt Grain Co., Inc.*, 41 B.R. 678 (Bkrtcy.W.D.La.1984); *In re Tobilar, Inc.*, 29 B.R. 672 (Bkrtcy.W.D. La.1983); *In re CBS Millwork Supply, Inc.*, 21 B.R. 960 (Bkrtcy.E.D.Pa.1982); *In re Popular Fruit & Produce, Inc.*, 21 B.R. 185 (Bkrtcy.S.D.N.Y.1982); and *In re Keyboards America, Inc.*, 30 B.R. 349 (Bkrtcy. E.D.Va.1983).

On the second issue, the Court holds that the IRS does not have standing as a creditor to object to the modification because its claims have been disallowed.

shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; and creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.

■ Under the Bankruptcy Code, a creditor is an "entity which has a *claim* against the debtor that arose at or before the order for relief concerning the debtor." 11 U.S.C. § 101(9). Stated conversely, an entity with no claim is not a creditor. *See In re Kreisler Group, Inc.*, 648 F.2d 86, 87–8 (2d Cir.1981). The IRS, therefore, lacks the necessary standing, and the Court will not address its written objection of October 24, 1985.

■ The IRS does, however, have standing as a governmental unit under Section 1129(d) to request that the Court consider and determine the third issue of whether the principal purpose of the modification is the avoidance of taxes, which is prohibited by the Code. On this issue, the Court finds that the IRS has failed to sustain its burden of proof and holds that the principal purpose of the proposed modification is not the avoidance of taxes. *See* 11 U.S.C. § 1129(d).

■ Bankruptcy Court is clearly the proper forum for determining whether a debtor's reorganizing plan has tax avoidance as its principal purpose. 11 U.S.C. § 1129(d). Bankruptcy Code Section 1129(d) provides:

Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. 77e). In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

With respect to bankruptcy matters, bankruptcy courts commonly make tax liability determinations. 11 U.S.C. § 505.[8] *See also In re Jon Co., Inc.*, 30 B.R. 831 (D.C.D.Colo.1983) (Section 505 grants the bankruptcy court jurisdiction for determining the legality of tax penalties assessed against a debtor corporation's officers and directors.); *In re Major Dynamics*, 14 B.R. 969 (Bkrtcy.S.D.Cal.1981) (In appropriate circumstances, bankruptcy courts have jurisdiction for determining disputes between the IRS and third-party creditors.).

The IRS has thrown the Court a curve in dealing with this issue. After participating for almost two years and arguing the tax issue at the October 25, 1985, hearing, the IRS, in its brief, contends that it made no formal request to argue the tax avoidance issue. The Court finds the IRS's position untenable.

■ Although Section 1129(d) of the Code apparently does not require the Court to determine the tax avoidance issue unless requested to do so by a governmental unit who is a party in interest, the Court cannot fairly consider plan confirmation and ignore the obvious tax avoidance question. Congress has given the bankruptcy courts the trust and responsibility for determining whether a reorganization plan is proper, including tax considerations. *See* 28 U.S.C. § 157(b)(1); 11 U.S.C. §§ 1129 and 505. The plan and proposed modification under consideration involve thousands of hours of effort by the Debtor, its employees, the creditors, and the Court. Millions of dollars and over ten thousand people are also affected. After lurking in the shadows for

---

**8.** Bankruptcy Code Section 505, in pertinent part, provides:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine—

(A) The amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or

(B) Any right of the estate to a tax refund, before the earlier of—

(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or

(ii) a determination by such governmental unit of such request.

almost two years, observing all bankruptcy matters, the IRS now attempts to escape this issue by maintaining that it did not technically make a request under Section 1129(d) and, therefore, the Court may not consider the issue. The Court is not going to allow the IRS to post facto determine that it may have been able to present a better argument at the October 25, 1985, hearing and thereafter maybe bring an action in tax court several years from now. Any other determination defeats effective and orderly reorganizations and judicial economy.

Attorney Cassling contends that although the Debtor's 35 million-dollar tax loss carry-forward was an important consideration, the Debtor's publicly held status is the principal purpose behind the proposed modification. One issue raised is whether "the principal purpose" should be strictly construed. Based on the following discussion, the Court holds "the principal purpose" should be strictly construed and essentially means "most important."

When comparing 11 U.S.C. § 1129(d) with its predecessor, Section 269 of the Bankruptcy Act, "the principal purpose" essentially means "the most important." *See* 5 *Collier on Bankruptcy* ¶ 1129.05 (15th ed. 1979). Section 269 of the Bankruptcy Act provided that:

> Where it appears that a plan has for one of its principal purposes the avoidance of taxes, objection to its confirmation may be made on that ground by the Secretary of the Treasury, or, in the case of a

State, by the corresponding official or other person so authorized. Such objections shall be heard and determined by the judge, independently of other objections which may be made to the confirmation of the plan and, if the judge shall be satisfied that such purpose exists, he shall refuse to confirm the plan.

Under the Bankruptcy Code, such purpose must be *the* principal purpose of the plan, not merely *a* principal purpose. 5 *Collier on Bankruptcy supra.*

Section 1129(d) of the Code and Section 269 of the Act were both intended to codify the holding of *Gregory v. Helvering,*[9] 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), which has also been incorporated in Internal Revenue Code Section 269 (1954).[10] *See* 5 *Collier supra.*

No cases were found as to what facts may constitute tax avoidance as "the principal purpose" under 11 U.S.C. § 1129(d). The IRS Code Reg. 1.269.3(b)(1) provides the following example as indicative of a fact pattern which has tax avoidance as its principal purpose, violating I.R.C. § 269:

> Individual A acquires all of the stock of L Corporation which has been engaged in the business of operating retail drug stores. At the time of the acquisition, L Corporation has net operating loss carry-overs aggregating $100,000 and its net worth is $100,000. After the acquisition, L Corporation continues to engage in the business of operating retail drug stores but the profits attributable to such busi-

**9.** In *Gregory v. Helvering,* the Court denoted the rule that a taxpayer, by means permitted by law, has a right to decrease the amount of what otherwise would be his taxes, or altogether avoid them. 293 U.S. at 469, 55 S.Ct. at 267.

**10.** Internal Revenue Code Section 269 provides: (a)(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the

basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. . . .

ness after the acquisition are not sufficient to absorb any substantial portion of the net operating loss carryovers. Shortly after the acquisition, individual A causes to be transferred to L Corporation the assets of a hardware business previously controlled by A which business produces profits sufficient to absorb a substantial portion of L Corporation's net operating loss carryovers. The transfer of the profitable business, which has the effect of using net operating loss carryovers to offset gains of a business unrelated to that which produced the losses, indicates that the principal purpose for which the acquisition of control was made is evasion or avoidance of Federal income tax.

In the instant case, Black Hawk anticipates generating between six and ten million dollars for the purposes of providing Liberty (Debtor subsidiary) funds to acquire other corporations with pre-tax profits of at least one million dollars. Black Hawk will ultimately control eighty percent (80%) of Liberty. While the Debtor's only asset will be stock in its subsidiary, its stock will continue to be publicly traded and may provide a viable source of funds for future corporate purchases (stock for stock exchange). The 35 million dollars' tax loss may be used to offset future profits of the one million-dollar pre-tax corporations which Liberty intends to purchase.

■ Because the Court finds that the Debtor's publicly held status is as important as the tax loss, the Court holds that the IRS failed to sustain its burden of proof and, therefore, the proposed modifi-

cation does not have tax avoidance as its principal purpose.

On the fourth issue, the Court finds that the policy of Code Sections 727(a) and 1141(d)(3)(C) are not violated and the Debtor is entitled to the benefits provided in § 1141(d)(1).

■ Chapter 7 corporations are clearly denied discharge under the Bankruptcy Code.[11] *See 4 Collier on Bankruptcy* ¶ 727.01[2] (15th ed. 1979); 3 *Norton Bankruptcy Law and Practice* § 65.05 (1981); *In re Kuempel Co.,* 14 B.R. 324, 327 (Bkrtcy.S.D.Ohio 1981); *In re Airlift Intern., Inc.,* 16 B.R. 639 (Bkrtcy.S.D.Fla. 1981); *Matter of Springfield Const. Co.,* 31 B.R. 395, 396 (Bkrtcy.S.D.Ohio 1983); *In re Hooton Co.,* 43 B.R. 389 (Bkrtcy.N.D. Ala.1984). The policy behind this is preventing the trafficking in corporate shells. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977);[12] S.Rep. No. 989, 95th Cong., 2d Sess. 130 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787. However, under Chapter 11 the plan is binding on creditors and the benefits of § 1141(d)(1) are available to a corporate debtor who meets either of the requirements of § 1141(d)(3)(a) or (b)."

■ Balanced against the unsecured creditors estimated as receiving nothing in the liquidating plan, the Debtor corporation proposes that the unsecured creditors receive 1,000,000 of its new common stock in full satisfaction of their claims. Estimates of unsecured claims are over 30 million dollars. Although the Debtor's corporate stock presently has limited value, Black Hawk Capital Corporation will use its best

---

**11.** Bankruptcy Code Section 1141(d)(3)(C) cross-references Section 727(a) and Section 727(a)(1) denies corporate discharge.

   Section 1141(d)(3)(C) reads as follows:
"The confirmation of a plan does not discharge a debtor if —the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title."
   Section 727(a)(1) provides:
"The court shall grant the debtor a discharge, unless—the debtor is not an individual."

**12.** With respect to Section 727(a)(1), the House Report stated that:
This section is the heart of the fresh start provisions of the bankruptcy law. Subsection (a) requires the court to grant a debtor a discharge unless one of eight conditions is met. The first condition is that the debtor is not an individual. This is a change from present law, under which corporations and partnerships may be discharged in liquidation cases, though they rarely are. The change in policy will avoid trafficking in corporate shells and in bankrupt partnerships.

efforts to generate up to 10 million dollars for investment in the Debtor's subsidiary, and, therefore, the Debtor's stock eventually may have substantial value.[13] "Moreover, the plan provides that the Debtor will engage in business after the consumation of the plan, as contemplated in § 1141(d)(3)(b)."

This Memorandum Decision constitutes the Court's Findings of Fact and Conclusions of Law in the above-entitled matter pursuant to Bankr.R.P. 7052 and 9014 and F.R.Civ.P. 52. An appropriate order will enter in accordance with Bankr.R.P. 9021.

13. On direct exam, Mr. Nelson, Black Hawk's Chairman of the Board, suggested that, if they "dream a little bit," Rath stock may be worth $20.00 a share some day.