**In re MAIN STREET AC, INC., dba Mentor Capital; fdba Main Street Athletic Clubs, Inc., Foxworthy Athletic Club, Meridian Athletic Club, Fremont Athletic Club, Second Street Athletic Club, and San Thomas Athletic Club, Successors to: Tech Start and Mentor Investors–I, L.P., Debtor.**

**Bankruptcy No. 98–56803–MM.**

United States Bankruptcy Court,
N.D. California,
San Jose Division.

April 27, 1999.

772

Wayne H. Thomas, Law Offices of Campeau and Thomas, San Jose, California, for debtor Main Street AC, Inc.

Robert S. Gebhard, Office of U.S. Trustee, San Jose, California, for Office of U.S. Trustee.

Sarah D. Moyed, Securities and Exchange Commission, Los Angeles, California, for Securities and Exchange Commission.

OPINION

MARILYN MORGAN, Bankruptcy Judge.

*I. Introduction*

Before the Court are two motions filed by the debtor. First, Main Street AC, Inc. seeks authority to issue certificates of indebtedness. Additionally, the debtor seeks approval of its third amended disclosure statement. Objections to both motions were raised by the Securities and Exchange Commission (the "S.E.C.") and the United States Trustee.

After the initial hearing on the motion to issue certificates of indebtedness, the Court indicated preliminarily that there may be no legal bar to the issuance of the certificates, applying the exemption afforded by § 364(f).[1] The Court cited as persuasive *In re Standard Oil & Exploration of Delaware Inc.,* 136 B.R. 141 (Bankr. W.D.Mich.1992). Under the circumstances of this case, however, the Court required a further showing in order to establish that Main Street's solicitation provides adequate disclosure to allow informed investment decisions. Additionally, the Court requested that the parties address the prohibitions of § 1129(d), the section that says "the court may not confirm a plan if the principal purpose of the plan is ... the avoidance of the application of section 5 of the Securities Act of 1933."

As explained below, the Court denies approval of the disclosure statement because, in contravention of § 1129(d), the principal purpose of the plan of reorganization is avoidance of securities registration laws. As a result of Main Street's inability to confirm its proposed plan, the motion to issue the certificates of indebtedness is denied as moot.

*II. Background*

Main Street AC, Inc. is a public company. It originally incorporated in 1995 to operate athletic clubs. For reasons not presently relevant, the athletic clubs developed financial difficulties. When the corporate assets were sold in receivership by its secured lender in July 1997, Main Street became a shell corporation without tangible assets or operations. Despite the loss of its assets, Main Street stock continues to trade on the National Association of Securities Dealers over-the-counter service. As late as March 5, 1999, Main Street's stock closed at a price of $0.18 per share bid and $0.32 asked. Main Street indicates that "the ability to trade on the public stock markets, was and perhaps still

1. Unless otherwise indicated, all citations are to the Bankruptcy Code found in Title 11 of the United States Code.

is, [its] most important asset...." Debtor Certificate Disclosure Statement at 3.

In an effort to capitalize on its public trading status, Main Street's president and chief executive officer, Chester Billingsley, actively solicited mergers with private companies. Billingsley has successfully completed numerous mergers and acquisitions during his career. In fact, he declares that the "AC" in Main Street AC, Inc. no longer denotes its athletic club heritage, but instead signifies "acquisition corporation." Billingsley explains how public trading increases value:

> There are relatively few people who can plunk down a million dollars or ten million to buy an entire business, contrasted to the majority of Americans who can invest $500 to buy 100 shares of a NASDAQ stock. This swelling of the pool of potential buyers increases the demand for the company's stock and causes the public price to be higher than the private price for the same stock.

Billingsley Letter at 1. In the words of the debtor, companies seeking to go public "may wish to combine with the Reorganized Debtor to get the benefit of the public markets without having to expend the funds or take the time to go through the registration process themselves." Debtor's Third Amended Disclosure Statement at 66.

Main Street conducted limited due diligence in its acquisitions. The disclosure statement explains that "[b]y being the easy acquirer that did not demand the normal diligence, even foregoing balance sheets and bank statements when their supply was resisted, the Debtor was able to increase the number of entities acquired...." Debtor's Third Amended Disclosure Statement at 19. It is important to note that audited financial statements were not provided to Main Street by the entities it acquired.

On August 10, 1998, Main Street entered into asset purchase agreements for interests in oil and gas wells and in automated teller machines ("ATMs"). The interests acquired can be described as non-performing. The sole consideration for the acquisitions was promissory notes totaling $13,655,000 with no money down. The notes, which are secured by all of the acquired assets, come due on August 1, 1999. The purchase agreements contemplate that Main Street will reorganize under Chapter 11 of the Bankruptcy Code and that the promissory notes will be exchanged for stock in the reorganized debtor.

As planned, Main Street filed its Chapter 11 case ten days after acquiring the oil and gas and the ATM interests. By agreement, the oil and gas wells and ATM machines continue to be managed by the sellers' management. Main Street shows a net loss from its operations during the Chapter 11 case. It has attempted to borrow additional funds from financial institutions without success. It has also attempted to obtain equity or debt financing through investment bankers, but has been unable to locate a firm willing to underwrite the proposed financing. To supplement its income, Main Street sold 800,000 shares of authorized but unissued common stock to its largest investor for 10¢ per share.

In order to fund its proposed plan of reorganization, Main Street seeks authority to issue certificates of indebtedness totaling at least $134,000 but not more than $500,000 to pay for certain repairs and operating enhancements of various wells, priority claims and legal expenses. The Unsecured Creditors Committee, through its Chairman, expresses enthusiastic support:

> We applaud the investors' and shareholder efforts to add fresh cash into Main Street AC, Inc. because we believe any dollars [sic] added strengthens the company and increases the probabilities and amounts that the creditors will ultimately receive. And from our point of view, it certainly can do no harm to the creditors to have such fresh added cash.

Letter From Unsecured Creditors' Committee In Support of Motion For Borrowing. Under the proposed plan, the certificates of indebtedness are convertible to equity shares in the reorganized debtor. Applying the exemption afforded by § 364(f), Main Street does not intend to register the issuance of the certificates of indebtedness with the S.E.C.

The proposed plan contemplates the issuance of approximately 59.9 million shares of stock, including the fully exercised shares of Series A, B, C, and D warrants, in exchange for claims and interests of the debtor's creditors and shareholders. Again, Main Street is claiming the exemption afforded by § 1145(a) and does not intend to register the stock with the S.E.C.

The asset purchase agreements establish a pre-determined formula for the issuance of shares that roughly exchanges one share in the reorganized debtor for each two dollars originally invested in the oil and gas and ATM interests. In its third amended plan, Main Street clarified that Main Street's stock would thereafter be distributed by the oil and gas and ATM interests to each of their 800 or so investors. The proportion of the total number of shares that would be held by the oil and gas and ATM investors, assuming all warrants are fully exercised, is 55%. Approximately 17% of the issuance would be held by the holders of the certificates of indebtedness. The balance of the issuance would be distributed to Main Street's unsecured creditors, its equity interests and a reserve maintained for employee stock and options. Main Street projects that "the combined business[es] (coupled with the issuance of the additional shares and Warrants to creditors, shareholders, and the former owners of the properties being acquired) will result in an active trading market that will create value and liquidity for all constituencies and generate a recovery for creditors." Debtor's Third Amended Disclosure Statement at 64.

Outside of bankruptcy, Main Street and the sellers would have to register under section 5 of the Securities Act of 1933, which they cannot afford to do. Main Street estimates that the minimum cost of public market expenses, such as audited financials and investment banking options, would be $10,000 for each acquisition and could be as high as $90,000 for a large merger. According to Billingsley, "in practical terms, taking a company public ... costs approximately $500,000, takes about eighteen months to accomplish and requires a degree of sophistication and specialization in the legal, accounting and management team not regularly encountered." Billingsley Letter at 1.

### III. Contentions of the Parties

The Securities and Exchange Commission argues that the disclosure statement cannot be approved under § 1129(d) because the plan's principal purpose is to avoid application of the securities registration laws. The S.E.C. states that if it were not for the ability to issue stocks by using the Bankruptcy Code to avoid the required registration process, the parties never would have entered into the asset purchase agreements. The United States Trustee concedes that the third amended disclosure statement provides sufficient information for creditors, shareholders and other parties in interest to make an informed judgment about the plan, but still objects to the legality of the plan.

Main Street responds that the principal purpose of the proposed plan of reorganization is to bring value to its creditors and investors. Further, Main Street argues that Congress enacted § 1145 in order to ease the financial burdens of the S.E.C.'s normal registration requirements.

### IV. Discussion

■ Congress imposed upon the Court an independent obligation to determine whether a disclosure statement includes adequate information, in part because "court supervision of the contents of the disclosure statement will protect the public investor from any serious inadequacies in

the disclosure statement." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 228 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6187.

 Under § 1125, "adequate information" is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor ... to make an informed judgment about the plan....

While the court has flexibility to ease the expensive and burdensome requirements of the securities registration laws, the court must require disclosure appropriate to the circumstances of each case. *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929–30 (Bankr.D.Colo.1981).

 The disclosure statement provided by Main Street is inherently flawed because the debtor never obtained reliable financial statements to support valuation of its acquisitions. This is essentially what concerned Congress when it indicated in the legislative history:

> If creditors are permitted to sell securities issued by the debtor under the plan in a public market without filing a registration statement or supplying a prospectus, steps should be taken to protect the purchasers of the securities. Because the debtor may be 'going public' for the first time, the market may be void of financial information concerning the debtor and will certainly be short of information concerning the reorganized debtor. Thus, [section 1125] requires the disclosure statement, as supplemented, to be supplied to the purchaser in lieu of a prospectus. This compromise protects the interest of both the public and the creditors.

H.R.Rep. 595, 95th Cong., 1st Sess. 238 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6197–98. Main Street's attempt to disclose the mere fact of its "limited due diligence" is not sufficient where the debt-

or intends to trade stock on the open market whose only value derives from the debtor's acquisitions. The lack of meaningful financial information regarding the oil and gas and ATM interests hinders an informed judgment by the hypothetical reasonable investor, rendering the disclosure statement inadequate.

 However a more serious flaw permeates the proposed plan. It is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed. *See In re Allied Gaming Management, Inc.*, 209 B.R. 201, 202 (Bankr.W.D.La.1997); *In re Curtis Center Ltd. Partnership*, 195 B.R. 631, 638 (Bankr.E.D.Pa.1996); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.1992); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr.D.Mass. 1991).

 Section 1129(d) prohibits a court from confirming a plan if the principal purpose of the plan is "the avoidance of the application of section 5 of the Securities Act of 1933." An objecting governmental unit bears the burden of proof on avoidance. 11 U.S.C. § 1129(d).

 Only a few reported cases have analyzed § 1129(d). *See In re Scott Cable Communications, Inc.*, 227 B.R. 596 (Bankr.D.Conn.1998); *In re Fay Associates Limited Partnership*, 225 B.R. 1 (Bankr.D.C.1998); *In re Hartman Material Handling Systems, Inc.*, 141 B.R. 802 (Bankr.S.D.N.Y.1992); *In re McLean Industries, Inc.*, 132 B.R. 267 (Bankr. S.D.N.Y.1991); *In re Rath Packing Co.*, 55 B.R. 528 (Bankr.N.D.Iowa 1985). The cases interpret the prohibition very narrowly. *See In re Rath Packing Co.*, 55 B.R. at 536 (equating "the principal purpose" with "the most important purpose"). A narrow interpretation is appropriate because the Bankruptcy Code contemplates that a reorganizing debtor may use the safe harbor of § 1125 and the exemptions

to registration available in §§ 1145(a) and 364(f). *See* Richard J. Morgan, *Application of the Securities Laws in Chapter 11 Reorganization Under the Bankruptcy Reform Act of 1978,* 1983 U.Ill.L.Rev. 861 (1984). What is prohibited under § 1129(d), however, is the use of a plan of reorganization principally to avoid federal securities registration and blue sky laws.

 In the instant case, there is no doubt that the principal purpose of Main Street's proposed plan of reorganization is the avoidance of securities registration laws for the entities it has acquired and for those it hopes to acquire in the future. The thrust of Main Street's marketing effort, as reflected in its acquisitions, has been directed at nonperforming investments whose equity owners seek to liquidate their holdings. From the outset, the parties to the asset purchase agreements intended that the consideration for the purchases was the ability to trade on the stock exchange. Under the proposed plan, Main Street is a vehicle for the sale of nonperforming investments, taking advantage of an active stock market.

While the debtor argues that its principal purpose is to return value to its unsecured creditors and existing shareholders, less than 28% of the newly issued stock is earmarked for creditors of Main Street other than the oil and gas and ATM interests. The principal and most important purpose of the plan is the avoidance of securities laws.

Having determined that the proposed plan of reorganization is not confirmable, the Court need not reach the issue of whether the debtor may issue certificates of indebtedness pursuant to § 364(c) because such an issuance would be meaningless absent confirmation of a plan.

### V. Conclusion

The principal purpose of Main Street's proposed plan is to avoid application of the securities registration laws. As a matter of law, the proposed plan may not be confirmed and the Court denies approval of the disclosure statement. Because the proposed plan is not confirmable, Main Street's motion for authority to issue § 364 certificates of indebtedness is denied.

Good cause appearing, IT IS SO ORDERED.