**In re SCOTT CABLE COMMU-
NICATIONS, INC., Debtor.**

**Bankruptcy No. 98–51923.**

United States Bankruptcy Court,
D. Connecticut.

Dec. 11, 1998.

Daniel H. Golden, Brian Cogan, Stroock & Stroock & Lavan, LLP, New York City, for Scott Cable Communications.

Craig I. Lifland, Zeisler & Zeisler, P.C., Bridgeport, CT, for Scott Cable Communications.

Deirdre A. Martini, Assistant United States Attorney, United States Department of Justice, Bridgeport, CT, for the Internal Revenue Service.

John V. Cardone, United States Department of Justice, Tax Division, Washington, D.C., for the Internal Revenue Service.

George Davis, Weil Gotshal & Manges, New York City, for Interlink.

Elizabeth Austin, Pullman & Comley, LLC, Bridgeport, CT, for Interlink.

Ira H. Goldman, Shipman & Goodwin, L.L.P., Hartford, CT, for Indentured Trustee and Jr. PIK Note Holders.

## MEMORANDUM AND ORDER ON OBJECTION TO CONFIRMATION

ALAN H.W. SHIFF, Chief Judge.

Scott Cable Communications, Inc. seeks confirmation of a Prepackaged Liquidating Chapter 11 Plan ("Plan"). The United States of America on behalf of the Internal Revenue Service ("IRS") has objected.

### BACKGROUND

Scott Cable, which was organized under the laws of Texas, is a corporation headquartered in Stamford, Connecticut. It is engaged in the ownership and operation of nine cable television systems in ten states. On February 14, 1996, Scott Cable filed a chapter 11 case in the District of Delaware. *In re Scott Cable Communications, Inc.,* Case

No. 96–172 (Bankr.D. DE 1996). That court confirmed a plan which "contemplated the likelihood of a sale of [Scott Cable's] assets on or before December 31, 1999." *Disclosure Statement § III(D)* at 7. In the latter part of 1997, Scott Cable received an offer from InterLink Communications LLLP to purchase its assets. On July 10, 1998, Scott Cable and InterLink executed an Asset Purchase Agreement ("Agreement") "pursuant to which InterLink agreed to purchase substantially all of [Scott Cable's] cable television systems and related assets for the sum of $165,000,000" ("Sale"). *Disclosure Statement § III(H)* at 12. The Agreement further stated that:

> the closing will occur no later than November 30, 1998, unless either party . . . elects to extend such date for up to an additional six months (not beyond May 31, 1999). . . . Notwithstanding the above, unless [InterLink] consents to an earlier Closing, the Closing shall occur no sooner than 60 days after entry of the order confirming the Plan, and is expressly conditioned on such confirmation occurring.

*Disclosure Statement § III(H)(iv)* at 15. On August 17, 1998, the Plan and a corresponding disclosure statement were disseminated. On October 1, 1998, Scott Cable ("Debtor") filed the disclosure statement and Plan, with a certification of the prepetition solicited votes. The Plan incorporates the Agreement, including the requirement that the closing of the Sale occur after the confirmation order.[1]

The Plan proposes a distribution that will pay all of the allowed secured claims of Finova Capital Corporation and the Senior Subordinated Secured PIK Note Holders (the first and second lienholders), a percentage of the allowed secured claims of Junior Subordinated Secured PIK Note Holders ("Jr. PIK Note Holders"), and "all administrative, priority, and unsecured creditors from the recoveries that would otherwise be payable to the [Jr. PIK Note Holders] . . ." *see Agreement, Article V at 13 – 16; see also Debtor's*

---

1. InterLink waived the requirement that the closing of the Sale occur no sooner than 60 days after confirmation. *See Transcript* at 25. Notwithstanding that waiver, the Debtor specifically emphasized the survival of the express condition that the closing occur after the entry of the order confirming the Plan. *Id.* at 27.

*Response to the Internal Revenue Service's Objection to Plan Confirmation ("Debtor's Response")* at 2.[2] The Plan does not provide for the payment of any federal or state tax liability because Scott Cable "believes that since any claims for taxes attributable to the sale arise subsequent to confirmation of the plan, they need not be provided for in the plan...." *Disclosure Statement § VIII(B)* at 49 (attached as Appendix A); *see also Plan* § 11.4 at 28. The Plan further provides for releases, injunctions, and limitations of liability, which are intended to protect several entities, including directors, officers, and Jr. PIK Note Holders, from future tax liability arising out of the Sale, and bind taxing authorities so that they may not pursue any such claims. *Disclosure Statement §§ IV(D)(1)–(3)* at 28–29. The effective date of the Plan is the closing date of the Sale. *Id.* § *IV(J)* at 37–38. On November 13, 1998, the court authorized the Sale. On November 16, 1998, the IRS objected to confirmation of the Plan.

## DISCUSSION

The bankruptcy code provides that "[t]he court shall confirm a plan only if all of the following requirements are met...." 11 U.S.C. § 1129(a). The IRS objects to confirmation for the reason that the Plan fails to provide for the payment of the capital gains tax attributed to the Sale as an administrative expense, *see* 11 U.S.C. § 1129(a)(9)(A). The IRS has also objected because the Plan provides for an injunction in violation of the Anti–Injunction Act, *see* 26 U.S.C. § 7421(a), and its principal purpose is to avoid taxes, *see* 11 U.S.C. § 1129(d).[3]

### A. Administrative Expense

The Debtor argues that since the allowed amount of the secured debt, $173,812,820,[4] exceeds the purchase price of the assets, there is no possibility of a distribution to the IRS. That prompts the Debtor to chide the IRS as "a spoiler of the worst kind" and "a petulant child who cannot get his way and seeks to create (economic) harm to other parties-in-interest." *Debtor's Response* at 1. The Debtor's position suggests that the priority accorded to taxing authorities and other administrative claimants, *see* 11 U.S.C. § 1129(a)(9)(A), should not be asserted if there are insufficient estate assets to satisfy those claims. The argument is a non sequitur. As the IRS argues, even if the proceeds are insufficient to satisfy the capital gains tax, confirmation of the Plan will adversely effect its right to pursue other responsible parties, *see infra* at 601–02; *see also Transcript* at 45. Moreover, the IRS has the right, if not the duty, to assert the application of bankruptcy and other applicable law which is intended to promote its taxing authority and prevent its erosion. Section 1129(a)(9)(A) provides:

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
>
>> (A) with respect to a claim of a kind specified in section 507(a)(1) ..., on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim....

11 U.S.C. § 1129(a)(9)(A) (1994).

▇ The Debtor characterizes the IRS's objection as an attempt to defeat the bankruptcy code's priority scheme. That argu-

---

**2.** Finova provided financing for Scott Cable in its prior bankruptcy, now has a first lien against all of the Debtor's assets and common stock, and is listed in Class 1. *Disclosure Statement § III(E)* at 8. The plan in the prior bankruptcy provided for distributions to creditors who now comprise classes 2 and 3 in the instant case. In the prior case, holders of public debentures were issued Senior Subordinated Secured Payment–In–Kind ("PIK") Notes, $5.5 million in cash, 100% of Class C Common Stock, and 15% of Junior Subordinated Secured PIK Notes. Holders of junior subordinated notes were issued 85% of the Junior Subordinated Secured PIK Notes and 100%

of Class B Common Stock. Class C Common Stock was freely tradeable while Class B Common Stock was not and is thus held by those to whom it was issued. *Transcript* at 73–76. In this case, holders of Senior Subordinated Secured PIK Notes are in Class 2, while holders of Junior Subordinated Secured PIK Notes are in Class 3. *Disclosure Statement § II(B)* at 5.

**3.** *See also* 11 U.S.C. §§ 1129(a)(1) and (2) (1994).

**4.** *See Debtor's Response* at 2.

ment overlooks the preferred status of administrative claims. The code's confirmation scheme elevates allowed administrative claims to a dominant priority such that unless the holders agree to a different treatment, a plan cannot be confirmed without full payment of those claims even if there are no estate assets to pay them. *See Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 456, 508 (S.D.N.Y.1994) (referring to § 1129(a)(9)(A) as the "administrative solvency" requirement, which is "the ability of the ... estate to satisfy administrative claims at the confirmation hearing.").

■ Code section 507(a)(1) provides a first priority for "administrative expenses allowed under section 503(b)...." *See also City of New York v. R.H. Macy & Co. (In re R.H. Macy & Co.),* 176 B.R. 315, 316 (S.D.N.Y. 1994) ("[T]he plain meaning of [section 503(b)] is that taxes incurred by an estate are entitled to an administrative expense treatment...."). The Debtor concedes that a capital gains tax is an administrative expense within the purview of § 503(b)(1)(B) if it accrues during the administration of the estate. *See Debtor's Response* at 4. *See also In re Goffena,* 175 B.R. 386, 391 (Bankr. D.Mont.1994). The Debtor further concedes that a taxable event will take place upon the closing of the Sale, but because the Plan mandates that the confirmation order occur before the closing, it argues that it has no capital gains tax liability and compliance with § 1129(a)(9)(A) is not required. Put another way, the Debtor will not incur a capital gains tax administrating the estate because the tax will accrue after the administration period. Thus the analysis must focus on whether the administrative period ends upon the confirmation of the Plan.

Section 114(b) defines the duration of the administrative period as follows:

> *Except as otherwise provided in the plan or the order of the court* confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

11 U.S.C. § 1141(b) (emphasis added).

■ An administrative period should extend beyond an order confirming a liquidating plan to the completion of the liquidation process unless there is a transfer of a debtor's benefits and burdens of ownership to another entity that completes the process. *See, e.g., Holywell Corp. v. Smith,* 503 U.S. 47, 112 S.Ct. 1021, 1024, 117 L.Ed.2d 196 (1992) (trustee as assignee who liquidates the debtor's property must pay income tax attributable to corporate debtor's property). The Debtor contends that confirmation of the Plan will vest the property of the estate in the "reorganized" debtor, the administration period will end, and the "reorganized" debtor will conclude the Sale. Those conclusions are belied by the fact that the Plan does not provide for the liquidation of the estate property until the postconfirmation closing of the Sale.

Contrary to the Debtor's assertions, the creation of the Scott Cable Liquidating Administrative Trust ("Trust"),[5] under which Scott Cable Management[6] was appointed to serve as trustee, does not alter the reality that the administrative period will continue beyond confirmation of the Plan. The Trust is merely a nominal transferee. The Order approving the Sale "authoriz[es] the *Debtor,*" not the Trust, "to sell ..., substantially all of its assets ... to InterLink ... pursuant to the terms and conditions of an Asset Purchase And Sale Agreement...."[7] The

---

5. It should be noted that the Trust is not created until the effective date, which, as discussed *supra* at 599, is the closing date. After the closing of the Sale by the Debtor to InterLink, the Trust will become the recipient of the "Retained Assets," which are defined in the Plan as "(i) the Proceeds, less any amounts paid by or at the direction of the Company on the Effective Date...." *Plan § 1.89* at 9. "Proceeds" are defined as "all cash or other property paid by the Purchaser, under the Asset Purchase Agreement...." *Plan § 1.81* at 9.

6. Scott Cable Management is a corporation wholly-owned by Bruce A. Armstrong, the Debtor's president, chief executive officer, and a director. *Disclosure Statement* at § IV(H) at 33. Pursuant to a Management Agreement dated December 18, 1996, Scott Cable Management currently directs the operations of the Debtor. *Id.*

7. *See Order Under 11 U.S.C. §§ 105, 363 and 365 Approving And Authorizing (i) The Sale of Substantially All Assets of the Debtor Free and Clear of Liens, Claims ...,* dated Nov. 13, 1998, at 1 (emphasis added).

Trust merely distributes the Sale proceeds. *See Disclosure Statement § IV(H)* at 33.

Section 1141(b) expressly provides that estate property will not vest in the debtor if the plan or the order confirming the plan provides otherwise. Both exceptions are applicable here. Section 362(c)(1) provides that acts "against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate. . . ." Thus § 362(c)(1) works with § 1141(b). If the confirmation of a plan vests property in a debtor, the automatic stay is no longer needed because the administrative period is over. *See United States v. Redmond,* 36 B.R. 932, 934 (D.Kan.1984). Conversely, if the administrative period is not over, the stay will remain in effect to protect the property of the bankruptcy estate. Here, the Plan proposes that "all injunctions or stays provided for in the Bankruptcy Case pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date," i.e., the closing date. *Plan, Article XI, § 11.9* at 29. The Debtor contends, however, that "the staying of actions against such property dealt with under a confirmed plan (in order to ensure that such orders are enforced) [will not] extend or continue the estate past the confirmation of the Plan." *Debtor's Response* at 7–8. That disclaimer is an unpersuasive attempt to retain the benefits of the automatic stay while claiming that the property protected by that stay is vested in a "reorganized" debtor.

Apart from the conclusion that the Plan does not vest property of the estate in the Debtor, it also is determined that any confirmation order entered by this court would specifically state that result. No business purpose is served by requiring the Sale closing to follow the order of confirmation. In fact, the Debtor has admitted that the timing is intended to satisfy Jr. PIK Note Holders who "would *never* have agreed to a sale that closed prior to confirmation of the Plan, because such a sale would have resulted in an administrative claim for Federal, state and local taxing authorities. . . ." *Debtor's Response* at 11 (emphasis added).

This prepackaged, presolicited plan is but one part of a coordinated purchase and sale transaction that had its conceptual genesis in Scott Cable's first bankruptcy in 1996. The prepetition negotiations with InterLink, the July 10, 1998 Agreement, and the presolicitation of the prepackaged Plan set the stage for this bankruptcy phase which has three interdependent parts: the November 13, 1998 order authorizing the Debtor to sell to InterLink, the confirmation of the Plan, and the subsequent closing of the Sale. No one part can stand without the others. They must be read together as part of the administrative period. Therefore, the Plan cannot be confirmed because it does not comply with § 1129(a)(9)(A).

### B. Anti–Injunction Act

The Plan proposes to enjoin all entities, including federal, state, and local taxing authorities from asserting a claim against, *inter alia,* "Company Releasees", i.e., directors, officers, and others; "Third Party Releasees", i.e., holders of interests, the indenture trustees, Jr. PIK Note Holders, and InterLink. *See Disclosure Statement §§ IV(d)(1) and (2)* at 28, (attached as Appendix B). *See also Plan § 11.4* at 28. In seeking the injunction, it is apparent that the Debtor, Jr. PIK Note Holders, and perhaps others, anticipate that taxing authorities will attempt to recover any unpaid capital gains tax arising from the Sale. Indeed, the Debtor concedes that since the capital gains tax is not treated as an administrative expense, Jr. PIK Note Holders will be exposed to tax liability without the proposed injunction. *See Transcript* at 78 and 81.

There is no direct bankruptcy code provision for the injunctive relief proposed by the Plan. The Debtor's reliance on § 105(a), which provides that this court may "issue any order, process, or judgment which is necessary to carry out the provisions of this title" is unavailing. Rather than facilitating the provisions of the bankruptcy code, as noted *infra* at 604, the proposed injunction offends the § 1129(d) prohibition against plans proposed for the principal purpose of tax avoidance. It is noteworthy that the Debtor would not be entitled to a discharge

upon confirmation of the Plan because it provides for the liquidation of substantially all of the property of the estate, the Debtor will not be engaged in business after the consummation of the Plan, and the Debtor, as a non-individual entity, would be denied a discharge if this case were a case under chapter 7. *See* §§ 1141(d)(3)(i), (ii) and (iii). Nonetheless, the proposed injunction would effectively grant a discharge to non-debtor entities. *e.g.,* Jr. PIK Note Holders. That result has been rejected by several courts. *See, e.g., United States v. Condel (In re Condel, Inc.),* 91 B.R. 79, 82 (9th Cir. BAP 1988); *In re Goldberg,* 221 B.R. 907, 909 (Bankr.M.D.Fla.1998) ("[T]he injunctive relief which might be obtained under 11 U.S.C. § 105 is an extraordinary remedy and should only be used if it is essential to assist *and aid the rehabilitation process of a debtor.*") (emphasis added). As this court observed in *In re Carabetta Enterprises, Inc.,* which granted such an injunction:

> [p]ursuant to their authority under § 105, courts have stayed creditor actions against non-debtor third parties where they have found that the estate will be adversely affected because the action will impede the non-debtor third party from injecting funds into the reorganization, because the action would detract from the invaluable time and attention the non-debtor third party would otherwise devote to the continued operation of the debtor's business or the reorganization effort, or because the claims against the non-debtor third parties are really claims against the debtor and therefore impair the automatic stay.

162 B.R. 399, 405–06 (Bankr.D.Conn.1993) (citation omitted). Those criteria are not met in this liquidating case.

■ The IRS objects to the injunction arguing that it violates the Anti–Injunction Act, which provides, *inter alia,* that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person...." 26 U.S.C. § 7421.

An exception to the Anti–Injunction Act applies where the party seeking the injunction demonstrates that (1) it will be irreparably injured absent the injunction with no adequate remedy at law and (2) " 'it is clear that under no circumstances could the Government ultimately prevail' on the tax liability." *Randell v. United States,* 64 F.3d 101, 106 (2nd Cir.1995), quoting *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). Bearing in mind that this court "must 'take the view of the facts that is most liberal to the Commissioner, not to the taxpayer seeking injunctive relief,' " *id.,* the Debtor has not offered any evidence to satisfy its burden of proof. Specifically, the Debtor has not established the requisite irreparable injury because the entities who may be held responsible have an adequate remedy at law to challenge any tax assessment. To the contrary, the Debtor contends that the Jr. PIK Note Holders will prevail on the tax issue. *Transcript* at 81.

■ The IRS's assertion that the exception does not apply is supported by bankruptcy and tax law, that is, the policies which underlie both are in concert. The former prohibits the confirmation of a plan if its principal purpose is to avoid taxes. The Anti–Injunction Act, which is recognized in bankruptcy proceedings, is designed to protect "the government's need to assess and collect taxes as expeditiously as possible with a minimum of pre-enforcement judicial interference...." *Randell v. United States, supra,* 64 F.3d at 106. "[T]he specific and unequivocal intent of the Anti-injunction Act [is] not overridden by the more general authority granted to the bankruptcy court under 11 U.S.C. § 105(a)." *Morelli v. Alexander,* 920 F.Supp. 556, 559 (S.D.N.Y.1996); *In re American Bicycle Assoc.,* 895 F.2d 1277, 1279–80 (9th Cir.1990). As the court held in *In re Laminating, Inc.,* 148 B.R. 259, 263 (Bankr.S.D.Tex.1992):

> [t]o confirm the plan's injunction provision would foreclose the IRS from pursuing a congressionally-sanctioned avenue of tax collection. The goals of prompt and full tax collection that are behind the Anti–Injunction Act simply outweigh the need for an injunction against the IRS....

Therefore, the Plan cannot be confirmed because it violates the Anti–Injunction Act.

## C. Tax Avoidance Forbidden by § 1129(d)

■ The Debtor touts its Plan as a proposal that

is unquestionably in the best interest of *all* creditors because, among other things, it provides for a full recovery to all administrative, priority and unsecured creditors from the recoveries that would otherwise be payable to [Jr. PIK Note Holders], which arrangement was unanimously approved by those adversely affected holders.

*Debtor's Response* at 2 (emphasis in original).

Of course the validity of that statement depends upon the success of the Debtor's attempt to avoid the payment of a capital gains tax by scheduling the Sale closing after the confirmation order. The Debtor tries to justify the payment to unsecured creditors without paying the IRS on the authority of *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st Cir.1993). Reliance on that decision is misplaced. In *In re SPM,* a chapter 7 liquidation, the undersecured creditor agreed to share its proceeds with certain unsecured creditors, not including the IRS, which held a priority tax claim and objected. *In re SPM,* 984 F.2d at 1307. The circuit court upheld the agreement because, until all valid liens are satisfied, the § 726 distribution scheme is not utilized. *Id.* at 1312. *SPM* is inapplicable because chapter 7 does not require a plan and, therefore, is not subject to the confirmation requirements of § 1129.

While payment of "all administrative, priority and unsecured claims" may be the result if the Plan is confirmed, that result could not be achieved without avoiding the tax consequences of the Sale from which those payments would be made.

Code Section 1129(d) provides:

Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes....

11 U.S.C. § 1129(d).

The plain language of that section demonstrates congressional intent to insure the collection of allowed tax claims by providing a higher level of protection than the priorities established by § 1129(a)(9). While the (a)(9)(A) priorities relate to the payment of administrative expenses including the payment of taxes, § 1129(d) extends to the purpose of a plan. That analysis is especially important in cases where, as here, the Plan does not provide for the payment of taxes.[8]

■ The determination of the principal purpose of a plan may be made in the context of its surrounding circumstances.[9] A review of the relevant facts discloses the following: The Jr. PIK Note Holders will not be paid in full whether or not the Sale is conducted through a bankruptcy proceeding. *Debtor's Response* at 2. If the sale occurred outside of bankruptcy, the Jr. PIK Note Holders would be exposed to a capital gains tax. If the Sale were conducted in a bankruptcy context with the closing during the administrative period, the plan could not be confirmed unless all allowed administrative

---

8. It is noted that the scenario of a corporation's possible use of bankruptcy as a tax avoidance scheme was raised recently in the United States Supreme Court. *See* Transcript, U.S.S.CT, *Bank of America National Trust and Savings Association v. 203 North LaSalle Street limited Partnership,* No. 9717180, *Bank of America Nat. Trust and Savs. v. 203 North LaSalle Street Partnership,* 1998 WL 767503 (Nov. 2, 1998). In a question posed during oral argument, Justice Kennedy raised the concern that the corporate debtor in that case might have attempted that result. *Id.* at 28.

9. A confirmed plan takes on the attributes of a contract. *See Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.),* 221 B.R. 298, 303 (2nd Cir. BAP 1998) ("[C]onfirmed plan holds the status of a binding contract."). As

such its meaning is construed from its provisions. *Id.* at 303 (Unless there is ambiguity in a confirmed plan, a court should not look beyond the plain meaning of the text). In contrast, a proposed plan is an offer to provide for the payment of allowed claims and interests. Thus, it is useful in a § 1129(d) analysis to determine the intent of the proponent from all relevant facts including negotiations. *See* Terence L. Shen, Note, *Tax Consequences for a Tax-driven Plan of Reorganization Under Section 1129(d) of the Bankruptcy Code and Section 269 of the Internal Revenue Code,* 1994 COLUM BUS L.REV. 267, 273 (Under § 1129(d), events leading up to the underlying taxable transaction can be considered by a court in determining a plan's primary purpose.).

claims, including the capital gains tax accruing from the Sale, were paid in full. *See* § *1129(a)(9)(A)*. The payment would come from the Sale proceeds otherwise available to the Jr. PIK Note Holders. The Jr. PIK Note Holders are willing to pay some of the administrative claims but not the tax claims estimated at $30,000,000[10] because such a payment would "totally eliminate any recoveries to them." *Debtor's Response* at 12. If the closing occurred after the administrative period to avoid the Debtor's capital gain tax obligation, the Jr. PIK Note Holders would be exposed to that tax liability.

The Debtor has conceded that "[t]he principal purpose of the Plan ... has always been to structure a sale ... that is acceptable to [the Jr. PIK Note Holders]...." *Debtor's Response* at 1–2. It is apparent that in order for that group to benefit from the Sale, the Plan would have to structure the Sale so that there would be no administrative capital gains tax and no future tax liability for the Jr. PIK Note Holders, and that is its principal purpose. Accordingly, the Plan does not escape the § 1129(d) prohibition, and it cannot be confirmed.

### ORDER

The objection of the IRS is SUSTAINED; confirmation is DENIED; and

IT IS SO ORDERED.

### Appendix A

DISCLOSURE STATEMENT, DATED AUGUST 17, 1998 For The Prepackaged Liquidating Chapter 11 Plan For SCOTT CABLE COMMUNICATIONS, INC.

VIII. *FEDERAL INCOME TAX CONSEQUENCES*

B. TAX CONSEQUENCES TO DEBTOR ARISING FROM THE SALE OF THE SALE ASSETS

The Sale of the Sale Assets to the Purchaser in connection with the consummation

of the Plan will be treated as a taxable sale for Federal income tax purposes. Accordingly, the Company will recognize gain or loss on each of the Sale Assets equal to the difference between the amount of the sale consideration allocated to such Sale Asset and the Company's tax basis for such Sale Asset. The Company has estimated that after taking into account the amount of its consolidated NOLs, as discussed above, the Sale will generate a Federal income tax liability to the Company of approximately $29.9 million, and a State income tax liability of approximately $7.5 million. The Company files State income tax returns in Arkansas, California, Colorado, Connecticut, Louisiana, Nebraska, New Mexico, North Dakota, Ohio, Texas and Virginia.

HOWEVER, THE PLAN DOES NOT PROVIDE FOR THE PAYMENT OF THE AMOUNT OF THIS FEDERAL INCOME TAX LIABILITY (OR OF ANY STATE OR LOCAL INCOME OR SIMILAR TAX LIABILITY ATTRIBUTABLE TO THE SALE). RATHER, THE COMPANY BELIEVES THAT SINCE ANY CLAIMS FOR TAXES ATTRIBUTABLE TO THE SALE ARISE SUBSEQUENT TO CONFIRMATION OF THE PLAN, THEY NEED NOT BE PROVIDED FOR IN THE PLAN AND SUCH CLAIMS WILL BE PAYABLE ONLY TO THE EXTENT THAT PROCEEDS REMAIN AVAILABLE AFTER THE DISTRIBUTIONS CONTEMPLATED UNDER THE PLAN ARE MADE.

AS DESCRIBED ABOVE, THE COMPANY BELIEVES NO PROCEEDS WILL BE AVAILABLE AFTER PAYMENT OF CLAIMS ENTITLED TO PAYMENT UNDER THE PLAN. THE CONTEMPLATED FEDERAL, STATE AND LOCAL INCOME OR SIMILAR TAX LIABILITIES THAT MAY ARISE AS A RESULT OF THE SALE ARE, IN ANY EVENT, JUNIOR IN LEGAL PRIORITY TO THE SECURED CLAIMS OF FINOVA, THE SENIOR SUBORDINATED SECURED PIK

---

**10.** *See Disclosure Statement* at 49. This federal tax liability estimation does not include state tax

liability, which is estimated at $7,500,000. *Id.*

NOTE CLAIMS AND THE JUNIOR SUB-ORDINATED SECURED PIK NOTE CLAIMS AND ARE ENTITLED TO BE PAID ONLY AFTER THOSE CLAIMS ARE SATISFIED IN FULL. ACCORD-INGLY, EVEN IF SUCH CLAIMS WERE PROVIDED FOR UNDER THE PLAN, SUCH CLAIMS WOULD BE JUNIOR IN RIGHT OF PAYMENT TO THE PREVI-OUSLY DESCRIBED SECURED CLAIMS. SINCE THERE WILL BE NO ASSURANCES CAN BE GIVEN THAT THE IRS WILL NOT CHALLENGE ANY OR ALL TAX CONSEQUENCES OF THE PLAN.

EACH HOLDER OF AN ALLOWED CLAIM IS STRONGLY URGED TO CON-SULT ITS OWN TAX ADVISOR RE-GARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES TO IT OF THE PLAN.

## Appendix B

DISCLOSURE STATEMENT, DATED AUGUST 17, 1998 For The Prepack-aged Liquidating Chapter 11 Plan For SCOTT CABLE COMMUNICATIONS, INC.

## IV. *DESCRIPTION OF PREPACKAGED LIQUIDATING CHAPTER 11 PLAN*

### D. *Releases, Injunctions and Limitations of Liability*

#### 1. *Releases*

a. As of the Effective Date, the Company, its Affiliates and shareholders, acting deriva-tively, are deemed to have forever waived and released unconditionally (i) each of the Company's present and former officers, di-rectors, employees, agents, consultants, ad-visors, attorneys, accountants and other rep-resentatives and their respective successors, assigns, and Affiliates (collectively, the "Company Releasees"), and (ii) the holders of Interests, the Indenture Trustees (except as otherwise provided in the Indentures), the Administrative Trust and its Trustee (except as otherwise provided in the Administrative Trust Agreement), the Officers and Di-rectors' Indemnity Escrow Fund and its Agent (except as otherwise provided in the Officers and Director's Indemnity Escrow Fund Agreement), Finova, the Indenture Trustees (except as otherwise provided in the Indentures), the holders of Class 2 and Class 3 Claims (in their capacity as holders of such Claims), and the Purchaser (except as other-wise provided in the Asset Purchase Agree-ment) (collectively, the "Third Party Releas-ees") from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever whether known or unknown based in whole or in part on any act or omission by, or any transaction, agreement, event or other occurrence taking place prior to, on or after the Confirmation Date, in any way relating to the Company, the Bankruptcy Case, the Plan, the creation of the Administrative Trust, the creation of the Officers and Directors' Indemnity Es-crow Fund, the Sale or the treatment of liabilities arising prior to or subsequent to the Confirmation Date (the "Released Claims").

b. In addition, as of the Effective Date, except as otherwise provided in the Plan, each holder of a Claim (i) that has accepted the Plan, or (ii) whose Claim is in a Class that has accepted the Plan, or (iii) that may be entitled to receive a distribution of prop-erty under the Plan, shall be deemed to have waived and released the Company, its Affili-ates and shareholders, the Company Releas-ees and the Third Party Releasees from the Released Claims, *except for* (i) Allowed Claims that can be asserted under the Plan, (ii) claims or causes of action under the Asset Purchase Agreement, (unless otherwise pro-vided in the Asset Purchase Agreement), or (iii) claims third parties may have against each other that are unrelated to the Compa-ny and the Bankruptcy Case.

#### 2. *Injunctions.*

Except as otherwise provided in the Plan, the Administrative Trust Agreement, the Of-ficers and Directors' Indemnity Escrow Fund Agreement or the Asset Purchase Agreement, confirmation of the Plan shall, provided the Effective Date occurs, perma-nently enjoin all Entities holding Claims against, Interests in or other debts or liabili-ties of the Company whether arising before,

on or after the Effective Date, from taking any actions to assert or enforce any such Claims, Interests, debts or liabilities against the Company, the Company Releasees, the Third Party Releasees, the Sale Assets, the Proceeds or the Excluded Assets *except for* (i) Claims that may be asserted under the Plan, (ii) claims arising under the Asset Purchase Agreement that may be asserted by or against the Purchaser, (iii) claims creditors or other third parties may have against each other that are not related to the Company or the Bankruptcy Case, and provided further that unless previously waived in the Asset Purchase Agreement or the Plan, all defenses and counterclaims of the Company or the Administrative Trustee thereto are preserved. **This injunction will bar, among others, Federal, State and local taxing authorities from asserting any claims against the Entities described in this paragraph based upon income or similar taxes that may arise as a result of the Sale.**