**In re Stephen N. HORWITZ, d/b/a Kettle Restaurants and Horwitz Enterprises, Inc., Debtors.**

**Bankruptcy Nos. 94–10540–BH, 94–10982–BH.**

United States Bankruptcy Court, W.D. Oklahoma.

May 16, 1994.

Donald F. Heath, Jr., Oklahoma City, OK, for debtors in possession.

Douglas N. Gould of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, OK, and Paula W. Hinton of Akin, Gump, Strauss, Hauer & Feld, L.L.P., Houston, TX, for Kettle Restaurants, Inc.

*MEMORANDUM OF DECISION AND ORDER DENYING MOTION FOR NEW TRIAL*

RICHARD L. BOHANON, Bankruptcy Judge.

The issue is whether a bankruptcy court may enlarge the time for a trustee [1] to as-

---

1. In bankruptcy, until one is actually appointed, the debtor-in-possession is the trustee. 11 U.S.C. § 1107(a).

sume or reject unexpired leases of nonresidential real property when the motion for enlargement of time is made within the statutorily prescribed 60 day period, but no order granting it is entered within that period.

11 U.S.C. § 365(d)(4) provides:

... in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

These debtors leased and operated several restaurants and apparently encountered a need for financial reorganization. In January, 1994 their voluntary chapter 11 petitions were filed and consolidated for purposes of administration. On the 58th day after the orders for relief[2] they moved for enlargement of the time to assume or reject their leases, but there has been no order granting this motion.

Earlier the landlord had sought an order that the leases were terminated prior to bankruptcy for reasons based upon state law and, therefore, were not property of the bankruptcy estate that could be assumed. When this motion came on for hearing I determined *sua sponte,* from noticing the file, that the landlord's request was moot for the statutory time to assume the leases had expired, they were deemed rejected, and the debtors-in-possession were obliged to surrender the restaurants to the landlord immediately.

■ The debtors-in-possession then timely made this motion for new trial pursuant to Fed.R.Bankr.P. 9023, contending the order was erroneous as a matter of law. They argue that section 365(d)(4) should not be applied literally for it is ambiguous or leads

to a result which is absurd or harsh and, therefore, ought to be interpreted to allow entry of an order enlarging the time even after expiration of the 60 days.[3]

This leads directly into the area of statutory interpretation and the "plain meaning" rule as set down by the Supreme Court. This topic has been the subject of consideration in this Court in recent months. *See eg. In re Brollier,* 165 B.R. 286 (Bankr.W.D.Okl. 1994); *In re ZRM–Oklahoma Partnership,* 156 B.R. 67 (Bankr.W.D.Okl.1993); *In re Barnes,* 146 B.R. 854 (Bankr.W.D.Okl.1992); *In re Simpson,* 1994 WL 114693 (Bankr. W.D.Okl., Mar. 25, 1994) (No. BK–93–15802–BH); *United States v. Angel,* 1994 WL 69516 (Bankr.W.D.Okl., Feb. 24, 1994) (No. 93–11683–BH).

The debtors rely primarily upon *Southwest Aircraft Services, Inc. v. City of Long Beach,* 831 F.2d 848 (9th Cir.1987), cert. denied, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988), together with its progenitors and progeny. We can thus commence the analytical process with a consideration of this decision. It begins by finding that "the meaning of the words of section 365(d)(4) is not entirely clear." *Id.* at 849. Following this it proceeds to conclude that the 60–day term modifies the phrase "for cause," apparently meaning that the "cause" for enlarging the time must arise within the 60 days, but the order can be entered at any time. It then follows by saying that "[t]his more liberal reading of the statute would allow the bankruptcy courts to operate with greater freedom and flexibility." *Id.* at 850.

Thus, having reached a conclusion that the statute is ambiguous, therefore entitled to a liberal reading, it is easy for the *Southwest* Court to avoid results it considers "arbitrary" and "fortuitous" by reaching what it considers to be the best policy for rehabilitation of distressed lessee-debtors. Since a literal reading of the statute leads to what it considers to be the wrong result *Southwest,* therefore, concludes that the statute as writ-

---

**2.** Commencement of the voluntary cases constituted the orders for relief. 11 U.S.C. § 301.

**3.** An additional argument put forth by the debtors-in-possession is that they were denied an opportunity to respond to the court's own mo-

tion. To whatever extent this argument may have validity it is moot for they have been afforded ample opportunity to brief the issues on this motion.

ten does not reflect the intent of Congress. It says candidly that this interpretation "strikes the balance between creditor protection and debtor relief that Congress intended, and is eminently reasonable, fair and sensible." *Id.* at 853. There is, thus, little question but that the Court of Appeals is deciding what it believes to be the best policy under the circumstances—in sum, it is announcing what it thinks the law ought to be. I can only agree with the dissenting judge when he says "[t]he majority ignores the plain meaning and the structure of the pertinent portions of section 365(d)(4)" and "[w]e do not sit to second-guess the wisdom of their choices and 'the course Congress has set.'" *Id.* at 854, 856.

If this Court were in the 9th Circuit I would be bound to follow *Southwest.* I am not in that Circuit, however, and am unable to conscientiously read the statute the way that Court does. It is probably worth noting at this point that the statements and allegations made by the debtors-in-possession in this case would, if proven, show that it is in the best interests of the bankruptcy estate to provide time for assumption of the leases and to reorganize the business for the benefit of all the creditors. In fact, a major creditor adopts this argument and urges that the motion be allowed. Even with this conceivably laudable goal in mind I am still unable to say the statute is unclear or to find the meaning created by *Southwest's* interpretation of the same congressional enactment.

The most that can be said for *Southwest* and other cases holding that section 365(d)(4) does not have a clear meaning[4] is that many of them were decided before the guidance provided by the Supreme Court in a series of cases dealing with the methodology for interpretation of the Bankruptcy Code. *See Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991); *Union Bank v. Wolas,* — U.S. —, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *Dewsnup v. Timm,* — U.S. —, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *Taylor v. Freeland & Kronz,* — U.S. —, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *Barnhill v. Johnson,* — U.S. —, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); *Patterson v. Shumate,* — U.S. —, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *Pioneer Investment Services v. Brunswick Associates, Limited Partnership,* — U.S. —, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); *Nobelman v. American Savings Bank,* — U.S. —, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); and *Rake v. Wade,* — U.S. —, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993).

In this already long line of cases decided in the last five years the Court says that when a provision has a plain meaning judges are to apply it and not otherwise explicate the Code.[5] While the line may not be perfectly straight it seems to come to a point which says statutes are to be applied in keeping with their ordinary language, unless to do that would lead to some result which is clearly at odds with an expressed congressional purpose. It is plain that limiting the time for a bankruptcy judge to rule on a trustee's motion to enlarge the time to assume or reject leases does not violate any avowed purpose announced by Congress.[6] Bank-

---

**4.** *See e.g. In re Ted Liu's Szechuan Garden, Inc.,* 55 B.R. 8 (Bankr.D.D.C.1985); *In re Edward Harvey Co., Inc.,* 68 B.R. 851, 859 (Bankr. D.Mass.1987); *Tigr Restaurant, Inc. v. Rouse S.I. Shopping Center, Inc.,* 79 B.R. 954 (D.E.D.N.Y. 1987); and *In re Wedtech Corporation,* 72 B.R. 464 (Bankr.S.D.N.Y.1987); *In re Southern Technical College, Inc.,* 148 B.R. 550 (Bankr.E.D.Ark. 1992); and *In re Berger's Babes 'N Bears, Inc.,* 149 B.R. 715 (Bankr.M.D.Fla.1993).

**5.** While there is no reason to think these decisions will be limited to cases construing the Bankruptcy Code they all happen to arise within

that context. *Cf. City of Chicago, et al. v. Environmental Defense Fund, et al.,* — U.S. —, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994) where the Court discusses the "plain meaning" doctrine in a case concerning the environmental laws.

**6.** In point of fact, the very legislative history cited by *Southwest* shows that Congress was responding to pressures from landlords to resolve their problems with delays inherent in the bankruptcy system. *Southwest, supra,* at 851. What could have been a better response to the landlords' demands than to have enacted section 365(d)(4)?

ruptcy judges routinely deal with "emergency" requests for relief. Creation of another situation demanding speedy attention is neither a burden nor an unexpected requirement.

The rules of analytical jurisprudence resulting from these Supreme Court decisions are cogently analyzed in Effross, *Grammarians at the Gate: The Rehnquist Court's Evolving "Plain Meaning" Approach to Bankruptcy Jurisprudence,* 23 Seton Hall L.Rev. 1636 (1993). This article is well reasoned and examines the line of cases thoroughly. There is no moment in paraphrasing it in this memorandum, but it is worth the effort to highlight two of the decisions which most bear upon the issues in this case.

The one most apposite is *Taylor v. Freeland & Kronz,* — U.S. —, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992). There the subject was Fed.R.Bankr.P. 4003 which limits the time for the trustee and creditors to object to a debtor's claim of exemptions to 30 days from conclusion of the meeting of creditors "unless, *within such period,* further time is granted by the court." (Emphasis supplied)

The debtor disclosed and claimed as exempt the proceeds of an employment discrimination judgment which was unliquidated at the time of the meeting of creditors. The trustee was fully aware of both the claim and that it was not exempt under any applicable law, but failed to object or to obtain an order enlarging the time to object within the prescribed 30 days. The judgment then became liquidated during the pendency of the bankruptcy case, and had a value exceeding $100,-000. Only then did the trustee complain and seek to have the fund turned over to the estate. He argued that a literal reading of Rule 4003 results in bad policy for it will encourage debtors to claim unauthorized exemptions in bad faith, hoping that objections will not be made through either oversight or lack of concern. His argument was supported by decisions from three Courts of Appeals.

The Supreme Court, however, holds unequivocally that the rule must be read according to its plain meaning even if that results in debtors exempting property in which they have no lawful claim. The Court says "[d]eadlines may lead to unwelcome results, but they prompt parties to act and they produce finality." *Taylor,* — U.S. at —, 112 S.Ct. at 1648.

Applying this result to the case at hand is evidently equally unwelcome for it allows the landlord to cause an immediate surrender of the estates' only income producing properties to the detriment of all the other creditors and, therefore, foreclose the possibility of a successful reorganization. This concern, however, does not permit me to alter the language of section 365(d)(4) and if application of the law causes untoward, unwelcome, arbitrary or fortuitous results it is for Congress to deal with any perceived bad policy.

*Taylor* was decided on a vote of eight to one and Justice Stevens is the lone dissenter. His opinion could be the movants' brief in this case. He writes that "there is no identifiable reason why ordinary tolling principles that apply in other contexts should not also apply in bankruptcy proceedings; indeed, the generally equitable character of bankruptcy makes it especially appropriate to apply such rules in this context." *Taylor,* — U.S. at —, 112 S.Ct. at 1650. He concludes that in his "view, it is a mistake to adopt a 'strict letter' approach [citation omitted] when justice requires a more searching inquiry." *Taylor,* — U.S. at —, 112 S.Ct. at 1652. These are the same theses advanced by the debtors-in-possession, but they appear only in the dissent and are conspicuously absent from the Court's decision.

Another in the line of "plain meaning" cases is *Patterson v. Shumate,* — U.S. —, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). There the Court reconciled a conflict among the circuits concerning whether or not the statutory phrase "applicable nonbankruptcy law" was limited only to state law or included *any* nonbankruptcy law. The case arose in the context of whether certain pension trusts may be claimed exempt.[7] The Court concluded that "[w]e must enforce the statute

---

7. This same issue was previously considered in this Court in *In re Burns,* 108 B.R. 308 at 316 (Bankr.W.D.Okl.1989) where I expressed my views concerning the plain meaning of the phrase "applicable nonbankruptcy law."

according to its terms." *Patterson,* —— U.S. at ——, 112 S.Ct. at 2247. In concurring Justice Scalia queries "whether our legal culture has so far departed from attention to text, or is so lacking in agreed-upon methodology for creating and interpreting text, that it any longer makes sense to talk of 'a government of laws, not of men.' " *Patterson,* —— U.S. at —— —— ——, 112 S.Ct. at 2250–2251.

■ In sum, while judges might crave the freedom to always decree what is equitable and socially useful in the cases before us the Supreme Court says that we do not possess it when a statute or rule provides clear direction. Conjecturally this might evolve into an agreed-upon methodology of statutory interpretation based on the distinction between absolute and discreet laws, rather than an inquiry centered on whether or not the law is ambiguous. This system would prefer distinguishing between types of statutes over attempting to find a balance between esoteric methodologies of interpretative techniques.[8] In other words, the analytical process might be simpler, ergo better, if it begins with a determination of whether the particular statute is absolute or discreet. Absolute statutes would be those which contain within their wording all that is necessary to make the decision. For example, in the case at hand all I need to do in order to decide the issue is to notice that the order was not entered within the 60 days. The result then follows absolutely. Discreet statutes would be those which require the judge to exercise discretion.

There are many provisions within the Bankruptcy Code where Congress pointedly authorizes, even requires, that the judges employ their discretion and an absolute methodology of interpretation cannot be readily applied. An example of this is found in 11 U.S.C. § 1129(b) where Congress says that a plan of reorganization can be confirmed over the objection of a rejecting class only if the court finds the treatment provided that class is "fair and equitable." The statute then continues to provide that "fair and equitable" includes satisfaction of certain absolute requirements which have expressed meanings. The Code also provides that "includes" is not limiting. 11 U.S.C. § 102(3). Therefore, once the absolute requirements have been satisfied, the decision for or against confirmation is placed squarely within the discretion of the judges and encompasses all their intrinsic perceptions of fairness and equity.[9]

Application of this discretion requires the judge to weigh objective factors such as the facts as found, the totality of the circumstances of the case, interplay with other statutes, precedents, reliable legislative history, treatises and statements of scholars. Perforce, however, it must also include subjective factors such as the judge's own sense of fair play, communal mores (viz common law), the lawyers' arguments and the force of their persuasion, and sometimes a prediction on how the Supreme Court or Court of Appeals would rule on the issue. However, we only reach this point because Congress has provided limited authorization for the exercise of judicial discretion. When the authorization is absent the courts may decide the issue only as Congress has directed.

Some would say this methodology improperly limits the influence of the judges in a common law system and fetters them to a rigid regime which may be contrary to the

---

8. This is not to imply that theorizing over the various methodologies of statutory interpretation cannot be an engaging exercise. *See e.g.,* Moore, *A Natural Law Theory of Interpretation,* 58 S.Cal. L.Rev. 277. Sometimes, however, these engaging exercises are not helpful to judges and lawyers in dealing with the issues before us.

9. Some other examples where Congress places broad discretion in the bankruptcy courts are found in § 1129(a)(3), "good faith"; § 330(a)(1), "reasonable compensation" for "necessary services" based on "the value of such services"; § 523, "willful and malicious," "intent to de-

ceive," "reasonably relied"; § 362(d)(1), "adequate protection"; § 365(b)(1)(C), "adequate assurance"; § 365, "executory contract"; § 1104(a)(1), "for cause, including fraud, dishonesty, incompetence, or gross mismanagement"; §§ 363(b)(1) and 547(c)(2), "ordinary course of business"; § 707(a)(1) and (b), "unreasonable delay" and "substantial abuse"; and use of the phrase "for cause" throughout the Code. This partial listing of provisions authorizing the courts to employ their discretion obviously is not intended to be complete.

public weal.[10]  If such is the case the fetter is not a new contrivance.  At the formation of the Union Alexander Hamilton wrote that "[t]o avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out· their duty in every particular case that comes before them ..."  *The Federalist No. 78*, at 510 (A. Hamilton) (The Modern Library ed. n.d.) [11]  Another of the founders, James Wilson who signed the Declaration of Independence, and the Constitution and served on the Supreme Court in its first term, said that "every prudent and cautious judge ... will remember, that his duty and his business is, not to make the law, but to interpret and apply it."  II *The Works of James Wilson* 502, (R. McCloskey ed. 1967).

▮  The discretion and latitude to be allowed the judges has been a subject of great controversy in all civilized societies.  And, they have dealt with the issue by various methods.  The Supreme Court, however, has shown the judges of the federal courts that we are to execute absolute congressional enactments when these issues come before us.  The Court's directive is clear and if its application leads to "unwelcome" results Congress is the exclusive authority for altering a statute.

The corollary is that an absolute methodology of construction is unquestionably more certain than one based only upon a judge's intrinsic notions of what is the best result for the case at hand.  Certainty allows lawyers to make meaningful predictions to their clients about how the court will rule on an issue.  When that can be done reliably more disputes will be resolved without resort to the courts which is perceived to be a socially desirable result.  In the bankruptcy context the Court is telling us that the benefits of predictability often outweigh the lofty objectives of maximization of returns to the estate for the benefit of the creditors and the debtor's aim of a fresh start.  In other words, the latitude rests solely in Congress.  It may establish an absolute rule or a discreet one.

In section 365(d)(4) of Title 11 Congress has provided an absolute rule which does not authorize me to employ any discretion or to apply any equitable principles.

The motion for new trial is, therefore, denied and the debtors-in-possession shall immediately surrender the leased properties to the landlord.

---

10.  Whether or not the system for resolution of disputes in judicial forums in the United States remains a common law system, under the trends evident from contemporary jurisprudence, is a subject of some debate.  *See eg, In re ZRM–Oklahoma Partnership, supra,* at p. 69, fn. 2.  It has been pointedly said that "[i]n the orthodox civil law tradition, the judge is assigned a comparatively minor, inglorious role as a mere operator of a machine designed and built by scholars and legislators."  J. Merryman, *The Civil Law Tradition,* (1969), p. 49.  The impetus driving our system towards the regime of the civilians may be undesirable to many but, due to the sheer weight of codified law in the United States, it is seemingly irrefutable.

11.  Interestingly, and apropos to a discussion of analytical jurisprudence, Hamilton argued against adoption of the first ten amendments to the Constitution.  He said that the Constitution contains all that is required for the limited grant of authority to the government and "I go further, and affirm that bills of rights, in the sense and to the extent in which they are contended for, are not only unnecessary in the proposed Constitution, but would even be dangerous.  They would contain various exceptions to powers not granted; and, on this very account, would afford a colorable pretext to claim more than were granted.  For why declare that things shall not be done which there is no power to do?  Why, for instance, should it be said that the liberty of the press shall not be restrained when no power is given by which restrictions may be imposed?"  *The Federalist No. 84,* at 559 (A. Hamilton) (The Modern Library ed. n.d.)