In re **FREYMILLER TRUCKING, INC., Debtor.**

**Bankruptcy No. BK–95–12095–BH.**

United States Bankruptcy Court, W.D. Oklahoma.

Jan. 8, 1996.

As Modified Jan. 10, 1996.

914

Judy Hamilton Morse of Crowe & Dunlevy, Oklahoma City, Oklahoma, for Debtor.

Lucinda Dennis of Bronson, Bronson & McKinnon, Los Angeles, California, for Unsecured Creditor's Committee.

Michael Paul Kirschner and Kwame T. Mumina of Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, Oklahoma, for Wells Fargo Bank.

*MEMORANDUM OF DECISION AND ORDER DENYING OBJECTION TO CONFIRMATION OF WELLS FARGO BANK, N.A.*

RICHARD L. BOHANON, Bankruptcy Judge.

Wells Fargo Bank, N.A. is the holder of a secured claim and objects to confirmation of the debtor's proposed plan of reorganization.

The essential facts show that the bank has a lien on real property of the estate to secure a debt whose current principal and interest is approximately $1,725,000. This debt has been in default for more than a year. An appraiser employed by the bank is of the opinion the property has a market value of $2,240,000; the real estate salesman employed to sell the property states that his opinion of market value is $2,500,000; and a real estate broker testifies his opinion is that it has a market value of $3,000,000. This is the sum total of the evidence offered on the issue of the amount of the debt and the value of the property.

The proposed plan provides that the bank retain its lien, the property will be sold, the proceeds used first to pay the bank's claim in full and then for the benefit of unsecured creditors. If the property has not sold within six months it will be transferred to the bank in full satisfaction of its claim.

The plan contemplates liquidation of the all the debtor's assets and the disclosure statement projects that the "equity" from the property in dispute will amount to almost 40% of the funds available for payment to holders of unsecured claims. Based on these assumptions unsecured claims would still receive less than 15% of their allowed amounts.

Since the bank objects the debtor seeks to "cram down" under 11 U.S.C. § 1129(b). The bank argues that, as to it, the plan is not fair and equitable. Specifically, it contends that under the plan it will not receive the deferred cash payments contemplated by section 1129(b)(2)(A)(i)(II). This first requires an examination of 11 U.S.C. § 1129(b)(1) and (2).

Section 1129(b)(1) provides simply that if other requirements are satisfied, a debtor may cram down if its plan does not discriminate unfairly and is fair and equitable with respect to each rejecting class. Section 1129(b)(2)(A) then deals specifically with secured classes and provides that the requirement of fairness and equity *includes* (1) that the secured creditor retain its lien and receive future installments, "deferred cash payments," sufficient to pay the claim in full, *or* (2) that the property be sold free and clear of its lien, *or* (3) that it receive the indubitable equivalent of its claim. It is essential to bear in mind that the rule of construction provides "includes" is not limiting and "or" is not exclusive. *See* 11 U.S.C. § 102(3) and (5). Thus, since the plan does not propose deferred payments or a sale free and clear, in order to meet the fair and equitable requirement the debtor must satisfy the third alternative.[1]

The issue is, therefore, does the plan provide the bank the indubitable equivalent of its claim and, if so, does it discriminate unfairly and is it fair and equitable with respect to the bank?

The analysis begins with an examination of the ordinary meaning of the language chosen by Congress. *See In re Brollier*, 165 B.R. 286 (W.D.Okla.1994) and *In re Horwitz*, 167 B.R. 237 (W.D.Okla.1994). Something is dubitable if it is open to doubt or question and, conversely, is indubitable if it is not open to any doubt. *See Webster's Third New International Dictionary, Unabridged* (1981). One might say, therefore, that the evidence of the requisite indubitable equivalent is present if, under the treatment proposed in the plan, there is no reasonable doubt but that the bank will receive the full

---

1. The bank argues that in all cases secured creditors must receive "deferred cash payments." This misconstrues the Code for that requirement applies only in case of the first alternative when the note is being paid in installments, and there is no independent requirement that satisfaction of the indubitable equivalent condition mandates these payments.

value of what it bargained for when it made the contract with the debtor. In other words, is there any real doubt but that, as a matter of fact, the bank will be paid in full? It goes without saying that, since we are operating in a court of law, the interrogatory can be answered only by an examination of the evidence in the record. What, then, does the evidence show the bank will be owed in six months and what does it show the property will be worth?

As stated earlier, the current amount of principal and interest is almost $1,725,000 and the interest accrues at $15,000 per month for a total obligation of $1,815,000. The contract was not offered in evidence but the parties agree it provides for attorneys' fees and costs. There is also no evidence of the amount of these claims. In order to not simply ignore them, I will assume fees of $50,000 and costs of $10,000. This means the total obligation will be $1,875,000.

Taking the bank's own appraisal, and setting aside the others which are significantly higher, the property will bring at least $2,240,000. The broker testified that his commission will not exceed six percent which reduces the amount to be realized to $2,105,-600.

The evidence also shows the property must bear the following additional expenses:

| | |
|---|---|
| Security | $14,000 |
| Utilities | 8,400 |
| Taxes | 60,000 |
| Insurance | 3,000 |
| Soil test | 4,000 |
| Land sale tax | 22,400 |
| Total | $111,800 [2] |

Thus, viewed in light of the evidence, the bank will be owed $1,875,000 and the property will net $1,993,800, resulting in a surplus of almost $120,000. Additionally, the evidence shows that a portion of the property is rented for $1200 per month and there are prospects of additional short term rentals which could realize $10,000 per month. Under the plan these receipts would be used to offset tax and other obligations, further increasing the bank's protection.

Viewed in light of all the evidence, therefore, the record demonstrates that the treatment provided the bank is the indubitable equivalent of its claim. The only condition is that it is required to wait an additional six months to receive payment in full, with interest at the contract rate and everything else it bargained for.

■ The only remaining issue is whether or not this treatment discriminates unfairly or is unfair and inequitable with respect to the bank. Since the debtor has shown the bank will receive the indubitable equivalent of its claim, the burden to demonstrate these discreet elements shifts. This quite simply can only be met by offering evidence from which the court could find discrimination or inequity. As an example, a secured creditor might show that the delay in receiving income would threaten its very existence; that it would cause severe regulatory difficulties; that there are facts demonstrating the collateral's value will diminish during the delay; that the delay would serve no reorganization purpose; or that the managers of the reorganized debtor are incapable of realizing the property's best values. Here the bank offers no evidence that would support a finding of discrimination, unfairness or inequity.

■ These are issues which, by their very nature, are inherently discreet and require that I consider all aspects of the case and the totality of all the circumstances. *See Horwitz, supra.* at 241. Put simply, is it discriminatory or inequitable for this bank to be required to sit still for six months, to receive payment in full—in order to provide a possibility for the holders of unsecured claims to receive something? If the bank succeeds in its objection and blocks confirmation, unsecured creditors receive nothing. If the property should realize the higher values, the members of the unsecured class may receive as much as 15% of their claims, or significantly more depending on the actual sales

---

**2.** In its brief served after the hearing the bank contends that there will be some other expenses and an unspecified item labeled "20% Depreciation." There is no evidence, however, to support these additional figures and, if the depreciation item concerns diminution in value during the waiting period, the only testimony concerning the real estate market in the area is that "it's stabilized and coming back."

price. These are the entities which provided, on credit, the fuel, oil, tires, supplies, repairs and other essentials which allowed the debtor to run its trucks.

This judge sees nothing unfair or inequitable, under the facts of this case, in requiring one of the nation's largest financial institutions to wait a mere six months to be paid 100%, in order for the unsecured creditors to have the potential of receiving at least something.

For the foregoing reasons I find that with respect to Wells Fargo Bank this treatment does not discriminate unfairly and is fair and equitable. Therefore, I conclude that the plan satisfies the requirements of section 1129(b) and the objection to its confirmation is denied.