**In re CRIIMI MAE, INC.,
et al., Debtors.**

No. 98–2–3115–DK.

United States Bankruptcy Court,
D. Maryland,
Greenbelt Division.

July 12, 2000.

Richard L. Wasserman, Venable, Baetjer and Howard, LLP, Baltimore, MD, Stanley J. Samorajczyk, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, Morton A. Faller, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, MD, for debtors.

Judy G.Z. Liu, Weil, Gotshal, Manges, LLP ,New York City, Troy C. Swanson, Kincaid, Cohen & Swanson, PC, Baltimore, MD, for Citicorp Securities, Inc./Solomon Smith Barney.

### MEMORANDUM OPINION

DUNCAN W. KEIR, Bankruptcy Judge.

On March 31, 2000, the debtors, CRIIMI MAE, Inc., CRIIMI MAE, Management, Inc., and CRIIMI MAE Holdings II,

L.P., filed the Second Joint Amended Plan and its Amended Disclosure Statement. By Order entered February 7, 2000, this court set a hearing to consider approval of the previous filed Disclosure Statement and directed debtors to give notice of the filing of Disclosure Statement and hearing. On April 25, 2000, debtors filed with the court a Third Amended Joint Plan and Second Amended Disclosure Statement and requested that the court consider approval of the Second Amended Disclosure Statement (hereinafter "Disclosure Statement"). After a review of the Disclosure Statement in comparison with the Joint Amended Disclosure Statement, the court determined that the modifications were not material and therefore there was no required re-noticing of the Disclosure Statement before the court would conduct the hearing to consider approval.

Although initially a number of objections were filed to the Amended Joint Disclosure Statement, at the hearing on April 25, 2000 (the "Hearing"), only Citicorp Securities, Inc./Solomon Smith Barney ("SSB")[1] appeared and argued in opposition to approval of the Disclosure Statement. All other objections had been withdrawn in light of the changes set forth in the Disclosure Statement, with the exception of a hand-written objection filed by shareholder, Thomas Gill. For the reasons set forth orally by the court on the record at the Hearing, the objection to approval of Disclosure Statement by Thomas Gill was denied.

SSB argued three issues at the Hearing. Subject to the opportunity to more closely study the last minute revisions set forth in the Disclosure Statement, SSB indicated that the revisions appeared to remedy additional issues that had been raised in its written objection.

The issues argued by SSB are as follows:

1. SSB asserts that it is the owner of certain securities which it holds under a Master Repurchase Agreement dated August 1, 1997 and Annexes thereto (collectively, the "Repo Agreement"). SSB further asserts that debtor CRIIMI MAE, Inc. ("CMI") has no right of ownership in those securities. The plan provides for the sale by CMI of some of the securities (the "Disputed Securities"), on or before the confirmation date, to create funds necessary to make disbursements under the plan. If CMI is not the owner of the Disputed Securities, SSB concludes that CMI cannot legally sell the securities and therefore as a matter of law the plan cannot be confirmed.

2. SSB asserts that should the court determine that it holds a security interest in the Disputed Securities, as opposed to an ownership interest, and that the obligations and arrangements under the Repo Agreement constitute a secured lending, the sale by CMI of the Disputed Securities, without affording to SSB a right to credit bid pursuant to 11 U.S.C. § 363(k), cannot constitute fair and equitable treatment of its secured claim as required by 11 U.S.C. § 1129(b)(2). SSB asserts that any sale of the collateral of a dissenting class of secured claim must be governed by section 1129(b)(2)(A)(ii). In response debtors argue that the proposed sale of the Disputed Securities and other terms of the plan, provide SSB the indubitable equivalent of its claim under section 1129(b)(2)(a)(iii). Therefore, debtors conclude that the plan can be confirmed without compliance with the credit bid requirement incorporated into section 1129(b)(2)(A)(ii).

3. SSB asserts that the treatment of its claim, consisting of the payment to it of a portion of the proceeds from the sale of the Disputed Securities, and a portion of proceeds derived from the Disputed Securities currently held in an interpleader fund, (with the use by the debtors of the

---

**1.** Pursuant to a Stipulation and Order entered by this court on December 18, 1998, Solomon Smith Barney, Inc. is the successor-in-interest to Citicorp Securities, Inc.

remaining proceeds from these sources to pay other claims), the amortized payment of the remaining approximate $35 Million Dollars of its claim over 4 years, (with a provision for replacement or additional collateral), does not constitute the indubitable equivalent of its claim. SSB concludes that the plan cannot be confirmed under 1129(b)(2)(A)(iii).

■ At a scheduling conference prior to the Hearing, the court informed the parties that objections to confirmation of the plan, as opposed to the adequacy of disclosure of information in the Disclosure Statement, would not be heard and determined at the Hearing, with limited exceptions. The exception announced was that the court (time permitting) would hear and determine objections to confirmation arising solely as a dispute of law and for which determination there was no material dispute of fact. "It is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed." *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr.N.D.Cal.1999) (citing, *In re Allied Gaming Management, Inc.*, 209 B.R. 201, 202 (Bankr.W.D.La.1997); *In re Curtis Center Ltd. Partnership*, 195 B.R. 631, 638 (Bankr.E.D.Pa.1996); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.1992); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr.D.Mass. 1991)).

In its argument before the court at the Hearing, SSB asserted that confirmation of the plan must be denied as a matter of law upon either and each of the first two enumerated issues set forth above. SSB conceded that the third issue, indubitable equivalence, is a question of fact, not determinable without an evidentiary hearing. *See In re James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir.1992) ("question of whether the interest received by a secured creditor under a plan of reorganization is the indubitable equivalent of his lien is one of fact"); *see also, In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir.1986) (finding indubitable equivalence in context of 11 U.S.C. § 361(3) to be "a question of fact rooted in measurements of value and the credibility of witnesses").

Debtors in argument, supported by the committees appointed in this case, asserted that the first enumerated issue (ownership v. lien upon the Disputed Securities) involved disputed material facts. Debtors concede that the second enumerated issue (must a cramdown involving sale of collateral meet the requirements of 1129(b)(2)(A)(ii) even if Debtors offer the indubitable equivalent of the creditor's claims) was solely a dispute of law.

After denying the objection to the Disclosure Statement by creditor Thomas Gill and making partial findings as to the adequacy of the Disclosure Statement, the court held open the record of the hearing for the submission of briefs on enumerated issues 1 and 2. In doing so the court explained that it would consider the matter under the same standard applicable to a motion for summary judgment. If as a matter of law, there being no material dispute of fact, the plan could not be confirmed, approval of the Disclosure Statement would be denied. If as a matter of law, there being no material dispute of fact, the treatment proposed by the plan does not violate the law, the Disclosure Statement would be approved and remaining issues as to confirmation would be heard at the hearing upon confirmation. If the court determines the second enumerated issue in favor of debtor but concludes that there is a material dispute of fact necessary for the resolution of enumerated issue No. 1, the Disclosure Statement must be modified to disclose the existence of that dispute and upon such modification would be approved. The disputed factual issue would be heard as a part of the confirmation hearing.

The parties have submitted briefs in accordance with the court's directive. The court finds that an additional hearing as to whether issues No. 1 and 2 may be re-

solved as a matter of summary judgment would not aid the court in its decision on these issues.

## I.

### *Did the Master Repurchase Agreement convey absolute ownership of the disputed securities to SSB?*

The first issue identified above requires the court to determine the exact nature of the interests conveyed by CMI to SSB, by the Repo Agreement.[2] If the Repo Agreement in effect pledged a lien upon the securities described in the Annexes, CMI retained ownership interests which may permit its proposed use of these securities under the plan. If the Repo Agreement transferred all ownership interests in the securities and CMI retained solely a contractual right as a buyer to enforce a repurchase obligation of SSB, the plan illegally proposes to permit CMI to dispose of property (securities) that are the sole property of SSB.

The distinction between a repurchase transaction and a secured lending, while critical to an issue in this bankruptcy case, is virtually without meaning as to the practical effects of the transaction and the purposes for which it is made. It is clearly an effort by the industry of creditors dealing in this type of transaction to avoid potential unfavorable treatment that a security interest might receive in bankruptcy.[3]

> Both security interests and repos purport to be present conveyances of property from one party in exchange for value given by another party plus an anticipated future conveyance of property from that party to the original party upon its performance of the contractual

obligation. The question is, therefore, whether a meaningful difference resides within the property rights acquired by the repo buyer in a security interest and a repo. In both a repo and in a typical secured transaction, the value given by the transferee is usually an advance of money, and the contractual obligation of the transferor is usually a payment of an amount of money equal to the original advance, plus a premium for the use of the money (i.e., interest). In a secured transaction, the secured party only obtains a limited property interest in the conveyed property, known as a security interest, which is subject to the limited property interest retained by the debtor, sometimes known as debtor's equity. In a sale, the conveyancer conveys its entire property interest to the conveyancee.

Schroeder, *supra* note 3, at 1017.

That is not to say that the law does not recognize the difference between the pledge of a lien versus the absolute conveyance with a promise to repurchase. *In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557 (D.N.J.1986). Indeed, in the bankruptcy context, Congress has legislated a definition of "repurchase agreement"[4] and enacted special treatment for the contractual rights of a participant in a repurchase arrangement that meets the definition under the statute.[5]

■ Although a repurchase agreement may serve the same economic ends as a secured loan, there is a critical difference in the quality of property interest conveyed to and held by the party which initially advances the funding. The critical

---

2. Exhibit 2. (References to exhibit numbers in this opinion are to exhibits 1–10 of the debtor's "Exhibits in Support of Supplemental Response to Objection of Solomon Smith Barney, Inc. and Citicorp Real Estate, Inc. to the Debtors' Amended Proposed Joint Disclosure Statement," attached to paper 1030 of the court file).

3. Jeanne L. Schroeder, *Repo Madness: The Characterization of Repurchase Agreements Under the Bankruptcy Code and the U.C.C.,* 46 Syracuse L.Rev. 999, 1010 (1996).

4. 11 U.S.C. § 101(47).

5. 11 U.S.C. § 559.

distinction is whether the transferor of the securities retained meaningful property interests inconsistent with an outright sale of the securities. One essential difference in the rights of a transferee under a true sale, as opposed to the transferee of a lien, is the right of the transferee to dispose of the securities and otherwise to deal with the securities as the absolute property of the transferee during the pendency of the repurchase/repayment obligation under the contract.

> In a true repo, the repo buyer has no obligation to return the conveyed security to the repo seller parallel to the obligation of a secured party to release collateral to the debtor upon performance of the secured transaction. Even more significantly, the repo buyer does not even have any obligation to maintain the [sic.] either the original security or any substitute collateral for the account of the repo seller pending the "repurchase." The repo buyer's only obligation is to sell an "equivalent" security to the repo seller. In many, if not most, repos, the repo buyer has complete power and right of possession, enjoyment and alienation over the underlying security. The security is delivered to the repo buyer upon the conveyance, and the repo buyer has the right to collect payments under the repo. Further, the repo buyer is permitted to sell the original security immediately upon its purchase, and is only required to acquire a new security to perform its back end obligation at the last moment in time.

Schroeder, *supra* note 3, at 1020. "Unlike a lender taking collateral for a secured loan, a repo buyer 'take[s] title to the securities received and can trade, sell or pledge them.'" *Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, 17 F.Supp.2d. 275, 298 (S.D.N.Y.1998) (quoting in part, *SEC v. Drysdale, Sec. Corp.*, 785 F.2d 38, 41 (2d Cir.1986)).

■ Although bankruptcy law often affects the exercise by parties of rights to property and under contract, it is the ap-plicable non-bankruptcy law which defines the property interests of the debtor and other parties as of the date of the petition. *Raleigh v. Illinois Dept. of Revenue,* —— U.S. ——, ——, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000) (citing, *Butner v. U.S.,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). Here, due to a choice of law provision in the Repo Agreement, the applicable law is the law of the State of New York.

■ The common law of New York follows the accepted rule that it is the objective intent of the parties to a contract that governs the contract's meaning and effect. *Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.,* 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977) (existence of binding contract "is not dependant on ... subjective intent ...;" rather court must look to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds."). Courts have applied this rule when analyzing repurchase agreements. "The key to the inquiry as to whether the repos ... should be characterized as purchase and sale agreements or secured loans lies in the intention of the parties." *Granite Partners,* 17 F.Supp.2d. at 300. "The objective intent of the parties 'expressed or apparent in the writing controls' the agreement's interpretation, while the 'undisclosed, subjective intent of the parties has no bearing' on the construction of the contract." *Id.* (quoting in part from *In re Bevill,* 67 B.R. at 586). Where the document is unambiguous, its meaning is an issue of law which the court should determine upon a motion for summary judgment. *Chimart Associates v. Paul,* 66 N.Y.2d 570, 572–73, 498 N.Y.S.2d 344, 489 N.E.2d 231, 233 (1986); *Mallad Construction Corp. v. County Federal Savings & Loan Association,* 32 N.Y.2d 285, 291, 344 N.Y.S.2d 925, 298 N.E.2d 96 (1973). "It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the

intent of the parties must be found within the four corners of the contract, giving a practical interpretation of the language employed and the parties' reasonable expectations." *Slamow v. Del Col,* 174 A.D.2d 725, 726, 571 N.Y.S.2d 335 (1991), *affirmed* 79 N.Y.2d 1016, 584 N.Y.S.2d 424, 594 N.E.2d 918 (1992).

■ However, "[w]here ... there are internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is admissible to determine the parties' intent." *Federal Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 43, 691 N.Y.S.2d 508, 512 (1999). As an initial matter then, the court must determine whether the Repo Agreement "on its face is reasonably susceptible to more than one interpretation." *Chimart Associates,* 66 N.Y.2d at 573, 498 N.Y.S.2d 344, 489 N.E.2d 231.

■ The title of the Repo Agreement, "Master Repurchase Agreement," is an indication of the intent of the parties, however, it not dispositive. *European Am. Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.),* 158 B.R. 926, 932 (Bankr.S.D.N.Y.1993) ("Labels cannot change the true nature of the underlying transactions."); *Williams Press, Inc. v. State,* 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299, 302 (1975) (meaning of contract may be distorted where undue force is given to single words or phrases); *Tougher Heating & Plumbing Co. v. State,* 73 A.D.2d 732, 733, 423 N.Y.S.2d 289, 290–91 (1979) ("It is a fundamental principle that the intention of the parties must be gleaned from all corners of the document, rather than from sentences or clauses viewed in isolation") (internal citations omitted). The court must examine the substantive provisions of the contract. Thus, it is not the characterization

contained within the contract but the effect of its terms which are relevant.

In examining the four corners of the Repo Agreement, the court first notes that it states:

> Although the parties intend that all transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, seller shall be deemed to have pledged to buyer as security for the performance by seller of its obligations under each such transaction, and shall be deemed to have granted to buyer a security interest in, all of the purchased securities which respect to all transactions hereunder and all income thereon and other proceeds thereof.

Exhibit 2, Master Repurchase Agreement, ¶ 6.

■ The first part of this paragraph seemingly is an unequivocal statement of the intent of the parties that the transaction be a purchase and sale and not a loan. The statement of intent is not vitiated or made equivocal by the protective provision set forth in the second part of the paragraph should the transaction be deemed to be a loan. The law has recognized the right of a party to act in a protective manner should a transaction intended to be otherwise, be deemed by a court to be some other type of transaction.[6] However, simply because the contract labels the transaction to be a sale and purchase does not mandate a finding that it actually conveyed an absolute transfer of the securities. The court must consider the whole of the contract in determining whether it expresses such an unambiguous intent within its four corners. *Kass v. Kass,* 91 N.Y.2d 554, 566–567, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) (entire document reveals parties' object and

---

6. UCC § 9–408, for example, allows a consignor or lessor of goods to file a financing statement as a protective measure should a court deem the transaction to be secured transaction. While such a filing by itself will not determine the nature of the transaction,

"if it is determined for other reasons that the consignment or lease is ... intended [to be a secured transaction], a security interest of the consignor or lessor which attaches to the consigned or leased goods is perfected by such filing." UCC § 9–408.

purpose); *Williams Press, supra,* 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (entire agreement must be considered); *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 347, 126 N.E.2d 271 (1955) (same).

■ The Repo Agreement provides that from time to time the parties may enter into transactions under which the Seller agrees to "transfer" to the Buyer, securities or other assets against the transfer of funds by the Buyer, with a simultaneous agreement by Buyer to transfer to Seller such securities at a date certain or on demand, against a transfer of the funds by Seller.[7] The word transfer would be consistent with an absolute purchase and sale of the securities and also would be consistent with a loan transaction in which only a security interest is transferred. Although the words "Purchased Securities" are used to identify the res of the contract, this term is defined in the contract as the securities transferred and thus does not itself lend any greater illumination upon which of the two types of transactions is being effectuated by the transfer. Purchased Securities are to be identified in writings including, where applicable, by CUSIP numbers.

Under paragraph 4 of the Repo Agreement, the Seller must maintain a margin value over the amount of the repurchase obligation in order to protect the Buyer from the possibility of the Seller's failure to perform Seller's repurchase obligation. While loan to value requirements are most common in lending transactions, the maintenance of such a margin value is also by itself not definitive as to the two possible interpretations of this contract. Similarly, under paragraph 5 the Seller is entitled to the equivalent of the income earned by the Purchased Securities after they have been transferred to the Buyer but before default by the Seller on the repurchase obligation. Normally, reservation of the right to receive income from the property would be consistent with a reservation of an ownership right in the property. However, the drafters of the Repo Agreement have been careful to make Seller's entitlement to an amount equal to such income, as opposed to a direct right against the income itself.

In paragraph 8 of the Agreement, the second sentence initially provides that "[a]ll of the Seller's interest in the Purchased Securities shall pass to the Buyer on the Purchase Date...." Standing alone, this provision would indicate an unambiguous intent to transfer all ownership rights in the securities. However, the remainder of the sentence provides:

and, unless otherwise agreed by Buyer and Seller, nothing in this agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to paragraph 3, 4, or 11 hereof or Buyer's obligation to credit or pay income to, or apply income to the obligations of, Seller pursuant to paragraph 5 hereof.

This second part of the sentence creates an ambiguity as to the otherwise unconditional statement concerning the Seller's interests passing to the Buyer on the purchase date.

■ If the transaction is an absolute sale, there would be no reason for the paragraph 8 to specifically empower the Buyer to engage in repurchase transactions with the Repurchased Securities or to otherwise sell, transfer, pledge or hypothecate the securities, subject to the duties of the Buyer to deliver the Purchased Securities to the purchaser at time of repurchase. Thus, reading the first

---

**7.** For ease of identification, this opinion refers to the parties by the defined terms (Buy-    er/Seller) used in the Agreement.

part of the sentence as a statement of absolute transfer could render the second part of the sentence superfluous to the contract. One rule of legal interpretation is that the court should strive to read all of the terms of the contract in a manner that gives effect to all such terms and renders no parts superfluous. *Bretton v. Mutual of Omaha Ins. Co.,* 110 A.D.2d 46, 50, 492 N.Y.S.2d 760, 763 (1985) ("policy's terms should not be assumed to be superfluous or to have been idly inserted."); *see, also, Tougher Heating & Plumbing, supra,* 73 A.D.2d at 733, 423 N.Y.S.2d at 291 ("every part of a contract should be interpreted to give effect to its general purpose").

More importantly, the obligation of the Buyer to transfer the Purchased Securities back to the Seller at the time of repurchase requires Buyer to transfer the same, not merely equivalent, securities. As stated in paragraph 3(c) of the Repo Agreement, termination of a transaction "will be effected by transfer to Seller or its agent of the Purchased Securities...." As previously noted, the term "Purchased Securities" is defined as "the Securities transferred ... and any Securities substituted therefore in accordance with paragraph 9" of the Repo Agreement.[8] Paragraph 9 provides that *Seller* may substitute securities for Purchased Securities with the acceptance of Buyer. It does not provide Buyer with the right to substitute securities in effectuating the repurchase upon termination of the contract. Thus, the seeming absolute transfer under paragraph 8 is limited by the absolute duty of the Buyer to produce back to the Seller the exact same securities upon termination of the transaction.

Further ambiguity creeps into the Repo Agreement upon the event of a default. Under paragraph 11(b), if the Seller defaults, "all Income paid after the [default] shall be retained by" the Buyer. This may imply that a right to income remains in the Seller until default, when it shifts to the Buyer. Such a retention of right to income until default is more consistent with a loan transaction than an absolute purchase. Further, the negative pregnant of this subparagraph would appear to be that until default, all income may not be retained by the Buyer. Also, if Buyer unequivocally received the right to all income at the time of the initial transfer, a provision permitting the Buyer to retain such income upon default of the Seller would be superfluous.

References within the contract to provisions of Title 11, United States Code, shed no greater illumination upon the parties' intent. Paragraph 19 of the Repo Agreement (titled "Intent") states that the parties recognize each transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, except as in so far as the type of securities subject to such transaction would render the definition inapplicable. 11 U.S.C. § 101(47) defines "repurchase agreement" as "an agreement ... which provides for the transfer of certificates of deposit, eligible bankers' acceptances, or securities that are direct obligations of, or that are fully guaranteed as to the principal and interest by, the United States or any agency of the United States...." The Purchased Securities set forth in the annexes to the Repo Agreement, are not certificates of deposit, bankers' acceptances, or obligations of the United States and there is no evidence that the Purchased Securities are guaranteed by the United States or any agency thereof. The parties by contract cannot place their agreement within the purview of a statute that on its face does not apply.

Nor does the provision in that paragraph 19 that each transaction is a " 'securities contract' as that term is defined in Section 741 of Title 11" address any distinction that is material to the outcome of this dispute. The definition of securities contract found under 11 U.S.C. § 741 (which provision is inapplicable to this

---

**8.** Exhibit 2, Master Repurchase Agreement, ¶ 2(p).

bankruptcy case pending under Chapter 11 of the United States Bankruptcy Code), includes a contract for purchase, sale *or loan of a security*. Thus, the statutory definition to which the contract refers encompasses either of the two possible interpretations of the contract (purchase or loan).

The additional language made part of the Repo Agreement and contained in the annexes does not clear up the ambiguities. The annexes provide in part: "title to all Purchased Securities shall pass to Buyer on the purchase date." However, the annexes further provide that "nothing contained herein, or in the Master Agreement shall be deemed to preclude Buyer from engaging in repurchase transactions with the Purchase Securities or otherwise pledging or hypothecating the Purchased Securities prior to the repurchase date."[9] As with the language in the Repo Agreement, the second sentence would be superfluous if the first sentence created an absolute transfer of all interests of the Seller at the time of the initiation of the transaction. Further, there is clearly not found in the second sentence a right to sell the Purchased Securities. Back to back repurchase agreements or hypothecation agreements which are tailored to make available to the Buyer the Purchased Securities at time of the repurchase obligation of Seller are clearly permitted. The annexes do not remove the duty of the Buyer to retransfer back to Seller the exact same Purchased Securities at the termination of the transaction.

After review of all of the terms of the Repo Agreement, this court finds that there is ambiguity within the Repo Agreement as to the nature of the interests in Purchased Securities transferred to, and the extent of interests retained, by CMI. Therefore, the court must consider extrinsic evidence to find the objective intent of the parties.

Although debtors have submitted some extrinsic evidence in support of their argument that the parties intended the Repo Agreement to be a secured lending, that evidence is not conclusive.[10] The court concludes that the intent of the parties involves issues of material fact which must be resolved upon a full evidentiary hearing.

Having found a dispute of material fact as to the ownership of the Disputed Securities, the court cannot conclude as a matter of law that the Plan contemplates an illegal use of property owned by SSB. Accordingly, debtors' disclosure statement will not be disapproved on that basis.

## II.

*Must a Cramdown Involving the Sale of Collateral Meet the Requirements of 11 U.S.C. § 1129(b)(2)(A)(ii) even if it Offers the Indubitable Equivalent of the Creditor's Claim?*

▮ SSB next argues that even if the court determines that it holds a security interest in the Disputed Securities, as opposed to an ownership interest, the sale by CMI of the Disputed Securities, without affording to SSB a right to credit bid pursuant to 11 U.S.C. § 363(k), cannot constitute fair and equitable treatment of its secured claim as required by 11 U.S.C. § 1129(b)(2).

9. Exhibit 2, Annexes, page 2.

10. For example, at least one corporate designee of SSB, Richard L. Jarocki, Jr., indicated his belief that absent a default, that SSB had no right under the Repo Agreement to sell the Disputed Securities. Exhibit 5, Jarocki deposition p 41. As previously noted, such a restriction on alienability is inconsistent with a SSB's claim that the Repo Agreement accomplished a complete transfer in ownership of the Disputed Securities. However, the court notes that the highly edited Jarocki deposition is but a small portion of the substantial discovery that has taken place in preparation for a trial between debtor and SSB (in part, on the issue of ownership of the Disputed Securities) in Adversary Proceeding No. 98–1637–DK. The court will not determine the issue of ownership without allowing the parties the opportunity for a full evidentiary hearing.

In its initial objection, SSB argued that the disclosure statement should be disapproved because it contemplated a plan that "does not satisfy *any of the three tests* [demonstrating fair and equitable treatment of its claim] contained in section 1129(b)(2)(A)." *Objection and Memorandum of Law of Solomon Smith Barney et. al.* at ¶ 58 (emphasis supplied). At the hearing on the disclosure statement, and in its supplemental memorandum in support of its objection, SSB refined its argument. It now asserts no plan that contemplates the sale of collateral of a dissenting class of secured claim can be found "fair and equitable" unless it complies with section 1129(b)(2)(A)(ii). SSB maintains that debtors' Plan fails that test because it does not provide SSB the right to credit bid its claim pursuant to 11 U.S.C. § 363(k).

Debtors respond that section 1129(b)(2)(A) is crafted in the disjunctive, and that a plan can be confirmed over a secured creditor's objection if it meets *any* of the three alternative tests set forth in subsections (i), (ii), or (iii). Debtors further argue that the proposed sale of the Disputed Securities and other terms of the plan meet the "fair and equitable test" set forth in section 1129(b)(2)(A)(iii) because they provide SSB with the "indubitable equivalent" of its claim. As previously noted, the parties agreed at the disclosure statement hearing, that the issue of whether the plan does provide the "indubitable equivalent" of SSB's claim cannot be determined without an evidentiary hearing.

The court agrees with debtors that a plan can meet the fair and equitable test imposed by section 1129(b)(2)(A) by complying with any of the three enumerated subsections. Section 1129(b)(2) provides as follows:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (I) or (iii) of this subparagraph; *or*

(iii) for the realization by such holder of the indubitable equivalent of such claims.

(Emphasis supplied).

By using the word "or", Congress plainly drafted section 1129(b)(2)(A) so that compliance with any of the enumerated subsections, (i), (ii) or (iii), would result in a finding that a plan of reorganization was fair and equitable as to the treatment of an objecting class of secured claims. Further, 11 U.S.C. § 102(5) provides that " 'or' is not exclusive ...". The legislative history to section 102(5) provides that "if a party 'may do (a) or (b)', then the party may do either or both." Thus, any doubt as to whether subsections (i), (ii), and (iii) were meant to be alternative paths to meeting the fair and equitable test of section 1129(b)(2)(A) is put to rest by the Bankruptcy Code itself. *Accord Wade v. Bradford,* 39 F.3d 1126, 1130 (10th Cir. 1994) (section 1129(b)(2)(A) requirements "are written in the disjunctive requiring the plan to satisfy only one before it could be confirmed" over secured creditor's objection); *In re Arnold & Baker Farms,* 85 F.3d 1415, 1420 (9th Cir.1996).

SSB nevertheless argues that where a plan proposes to sell a objecting secured creditor's collateral free and clear of liens, that the fair and equitable test can be satisfied only under section 1129(b)(2)(A)(ii).[11] SSB admits that both subsection (ii) and (iii) are applicable to the contemplated sale of the Disputed Securities, but asserts that while subsection (ii) deals specifically with the "sale ... of property ... free and clear of liens," subsection (iii) merely provides for the "realization ... of the indubitable equivalent" of the claim. SSB relies on *Beard Plumbing & Heating, Inc. v. Thompson Plastics, Inc.*, 152 F.3d 313 (4th Cir.1998) for the proposition that where "one section [of conflicting statutes] addresses a subject in a general way and the other section speaks to part of the same subject in a more specific manner, the latter prevails." *Beard Plumbing* at 320. SSB argues that subsection (ii) of 1129(b)(2)(A) is more specific than subsection (iii), and that it should govern. SSB also relies on *In re Kent Terminal Corp.*, 166 B.R. 555 (Bankr. S.D.N.Y.1994) which found that a plan that proposed to sell a secured creditor's collateral free and clear of liens could not be confirmed without affording a credit-bid opportunity. The court finds neither case persuasive on the issue now before it.

In *Beard Plumbing*, the Fourth Circuit sought to construe two apparently conflicting provisions of Virginia's version of the Uniform Commercial Code. Finding no case law jointly construing UCC provisions § 2–318 and § 2–715 with regard to economic loss, the court certified a question to the Supreme Court of Virginia. In its response, the state court relied on the rule of construction that where statutes conflict and "one section addresses a subject in a general way and the other section speaks to part of the same subject in a more

specific manner, the latter prevails," *Beard Plumbing*, 152 F.3d at 320.

SSB's attempt to apply the same rule in the instant case is misplaced, because, unlike the statutory provisions analyzed in *Beard Plumbing*, 11 U.S.C. § 1129(b)(2)(A) plainly indicates that subsections (i), (ii) and (iii) are to be treated as distinct alternatives. As a result, the provisions are not in conflict and the argued for rule of construction is inapplicable.

*Kent Terminal* is also inapposite. That case came before the United States Bankruptcy Court for the District of New York on a secured creditor's motion for relief from stay, or for dismissal of debtor's chapter 11 petition. Debtor's plan contemplated a contingent sale of the creditor's collateral, free and clear of liens, without giving the creditor an opportunity to credit bid. The debtor argued that the plan was confirmable either under 11 U.S.C. § 1129(b)(2)(A)(i) or (ii). The court concluded that the plan did not meet the fair and equitable test as to either subsection. As to subsection (ii), the court stated that the plan was not "fair and equitable" because it did not afford the creditor with the right to bid its lien in the event that the property was sold free and clear of liens under the plan. 166 B.R. at 567. Unlike the instant case, however, the *Kent Terminal* court had no occasion to test subsection (iii), because the debtor made no attempt to provide substitute collateral. As previously stated, because of the disjunctive construction of section 1129(b)(2)(A), if debtors can meet the test of indubitable equivalence, the plan can be confirmed without compliance with subsection (ii).

### Conclusion

In summary, the court finds that debtors' failure to provide to SSB a right to

**11.** Debtors argue that even under section 1129(b)(2)(A)(ii) there is no *absolute* right to credit bid, because section 363(k) allows the court to curtail a credit bid opportunity "for cause." Because the debtors have indicated that they intend to rely on subsection (iii) to meet the "fair and equitable" test of § 1129(b)(2)(A), the court need not here decide whether there is "cause" to deny a credit bid opportunity under subsection (ii).

credit bid does not render the plan unconfirmable as a matter of law. Debtors must prove by evidence at confirmation that the plan provides the indubitable equivalent of SSB's claim.[12] Further, the court finds that the plan's use of the Disputed Securities cannot be determined to violate 11 U.S.C. § 1129(a)(3) as a matter of law. The debtor will be required to prove at the confirmation hearing that such use of the Disputed Securities is legally permissible.

---

12. The court notes that if CMI is to succeed in meeting the "fair and equitable" test under this third alternative of section 1129(b)(2)(A), it faces a formidable task. Something is "dubitable" if it is "open to doubt or question." *Webster's Third New International Dictionary, Unabridged* (1993). Conversely, something is "*in* dubitable" if it is without question, or doubt. *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 915–16 (Bankr.W.D.Okla.1996).